Matthew K. Bishop (Mont. Bar No. 9968)
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59603
bishop@westernlaw.org

Kelly E. Nokes (Mont. Bar No. 39465862)
Western Environmental Law Center
208 Paseo del Pueblo Sur, No. 602
Taos, NM 87571
nokes@westernlaw.org

*Counsel for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| HELENA HUNTERS AND ANGLERS ASSOCATION, a non-profit organization; and the MONTANA WILDLIFE FEDERATION, a non-profit organization, | COMPLAINT |
| Plaintiffs, | |
| vs. | |
| LEANNE MARTEN, in her capacity as Regional Forester for Region One; the UNITED STATES FOREST SERVICE, a federal agency; and the UNITED STATES DEPARTMENT OF AGRICULTURE, a federal department, | |
| Federal-Defendants. | |

## INTRODUCTION

1. The Helena Hunters and Anglers Association and the Montana Wildlife Federation (collectively "Plaintiffs"), bring this civil action against Federal-Defendants (the "U.S. Forest Service" or "Service") pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, for violations of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 *et seq.*, and the Roadless Rule, 36 C.F.R. §§ 294.10 to 294.14.

2. This case challenges the Service's decision to authorize over 5,000 acres of logging and related activities, including road reconstruction and seven miles of new mountain bike trails *within* two Inventoried Roadless Areas ("roadless areas") along the Continental Divide in the Helena-Lewis and Clark National Forest ("Helena National Forest"). This controversial decision was made as part of the larger Tenmile-South Helena logging project ("Tenmile project").

3. The Tenmile project was approved in December, 2018 and is slated to occur over the next 15 years. In total, the Tenmile project includes over 17,000 acres of logging and burning and related road

activities. In this civil action, however, Plaintiffs are focused solely on the logging and related activities occurring within two roadless areas: the Jericho Mountain and Lazyman Gulch roadless areas. Plaintiffs are not challenging or otherwise objecting to any of the proposed logging, prescribed burning, road work, or watershed activities slated to occur *outside* the two roadless areas.

4.  After submitting extensive comments, meeting with Service personnel and community groups, and exhausting all other options and available remedies, Plaintiffs are compelled to pursue this civil action because the two roadless areas to be impacted by the Tenmile project provide crucial habitat and security for big game (elk and deer) and other wildlife species. The two roadless areas also provide important hunting opportunities for the public on our National Forest lands.

5. Plaintiffs' members and supporters have worked hard to secure protections for these two roadless areas for many decades and remain committed to ensuring the Service properly manages these roadless lands for big game and other wildlife species in accordance with NFMA, NEPA, the Roadless Rule, and the Helena National Forest's Land and Resource Management Plan ("forest plan").

## JURISDICTION AND VENUE

6. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 704.

7. Venue is proper pursuant to 28 U.S.C. §§ 1391(b),(e).

8. Plaintiffs exhausted all administrative remedies and have Article III standing to pursue this civil action. Plaintiffs have a significant, concrete interest in protecting big game habitat and security in the two roadless areas at issue in this civil action. This interest will be harmed by the Tenmile project and a favorable ruling from this Court will redress those harms. There is a present and actual controversy between the Parties. This matter is ripe for judicial review.

9. Final agency action subject to judicial review exists pursuant to 5 U.S.C. §§ 702 and 704.

10. This Court has authority to issue the relief requested under 28 U.S.C. §§ 2201 and 2202, and 5 U.S.C. §§ 702 and 706.

## PARTIES

11. Plaintiff, the HELENA HUNTERS AND ANGLERS ASSOCIATION ("Helena Hunters"), is a non-profit organization dedicated to protecting and restoring fish and native wildlife to all suitable lands and conserving our natural resources as a public trust,

vital to our general welfare. Helena Hunters works to promote the highest standards of ethical conduct and sportsmanship and promote outdoor recreation opportunities for all citizens to share equally. Members and supporters of the organization depend on healthy, functional, intact public lands of the Helena National Forest because they sustain and nurture their way of life. Helena Hunters brings this action on behalf of its members and supporters.

12. Plaintiff, the MONTANA WILDLIFE FEDERATION ("MWF"), is non-profit organization founded in 1936 when landowners and sportsmen banded together to restore depleted wildlife in Montana. MWF works every day to ensure abundant wildlife, healthy habitat and public hunting and fishing opportunities remain on our public lands and to ensure members of the public are able to use and enjoy our public fish and wildlife resources. MWF is comprised of 20 affiliate clubs from throughout Montana (including Helena Hunters) and has more than 5,000 members who are spread across the country. MWF is Montana's oldest and largest wildlife conservation organization. MWF brings this action on behalf of its members and supporters.

13. Helena Hunters and MWF (collectively "Plaintiffs") are committed to protecting and enhancing big game habitat and security (and reducing vulnerability) for elk and other big game and wildlife species and ensuring sufficient hunting opportunities remain on public lands within the Helena National Forest, the Divide landscape, the Jericho Mountain and Lazyman Gulch roadless areas, and the Tenmile project area.

14. Plaintiffs' members and supporters routinely recreate and hunt on National Forest lands within the Tenmile project area and within the two roadless areas at issue in this case and hope and plan to continue to do so in the future. Plaintiffs are also committed to ensuring the Service complies with its own forest plan and the law and takes a hard look at the environmental consequences of its decision and utilizes the best available science.

15. Many of Plaintiffs' members and supporters have been and continue to be adversely affected by the Service's actions and/or inactions as described in this complaint. Plaintiffs' members and supporters have, among other interests, aesthetic, professional, recreational, and personal interests in improving big game habitat and

security, reducing elk vulnerability on public lands, and protecting and enhancing hunting opportunities in the project area, including the Jericho Mountain and Lazyman Gulch roadless areas. Plaintiffs' members and supporters also have an interest in making sure public officials apply the best available science, comply with important forest plan standards, and take a hard look at all impacts before making important and significant decisions that affect public resources.

16.  Plaintiffs' members and supporters live near, recreate in and visit, and have specific plans to return soon to hunt, recreate in, and visit the Tenmile project area and the two roadless areas that are the subject of this complaint. These members and supporters are adversely affected by the Service's authorizing the Tenmile project – especially in the absence of full NEPA, NFMA, and Roadless Rule compliance. These members and supporters have also suffered procedural injury by the Service's failure to comply with NEPA and ensure compliance with NFMA and will suffer substantive harm if the Tenmile project proceeds, as authorized by the Service. The Service's decision challenged in this complaint will – as the Service concedes – reduce security and remove important hiding cover for big game species on our public lands,

including important hiding cover and security within the two roadless areas. Big game habitat and security will be reduced as a result of the Tenmile project, thereby harming Plaintiffs' interests. The Tenmile project also makes it less likely that important hiding cover will be provided for big game species in the project area, less likely that security will be properly managed and maintained, more likely that elk and other big game species will become overly vulnerable, and more likely that big game will be displaced from public lands, thereby reducing hunter opportunities.

17. Plaintiffs' members and supporters have not been compelled to participate in this lawsuit. The Service has disregarded (or ignored) these members' and supporters' comments and objections.

18. If this Court issues the relief requested, the harm to Plaintiffs' mission, members and supporters will be alleviated and/or lessened.

19. Defendant LEANNE MARTEN, is named in her official capacity as Regional Forester for Region One (Northern Region). Ms. Marten (and her deputy regional forester) are the federal officials who reviewed and ultimately rejected Plaintiffs' objection to the Tenmile project. Ms. Marten (and her deputy regional forester) are the Service

7

officials who determined that the Service's approval of the Tenmile
project complied with all "applicable laws, regulations, and the forest
plan."

20. Defendant the UNITED STATES FOREST SERVICE ("the
Service") is a federal agency within the United States Department of
Agriculture. The Service is responsible for agency actions challenged
herein.

21.  Defendant the UNITED STATES DEPARTMENT OF
AGRICULTURE is a federal department responsible for applying and
implementing the federal laws and regulations at issue in this
complaint.

## BACKGROUND

### *The Helena National Forest's Divide Landscape and Roadless Areas*

22. The Divide landscape in the Helena National Forest covers
approximately 265,185 acres on both sides of the Continental Divide,
from the Lincoln District boundary in the north to the Beaverhead-
Deerlodge National Forest boundary in the south.

23. The Divide landscape includes four roadless areas (and one smaller area of unroaded lands without special designation). These roadless areas include: Nevada Mountain, Jericho Mountain, Lazyman Gulch, and Electric Peak.

24. The Jericho Mountain and Lazyman Gulch roadless areas are within the Tenmile project area.

25. The Jericho Mountain roadless area straddles the Continental Divide and encompasses approximately 8,440 acres of public land. The Jericho Mountain roadless area is popular for hiking and hunting. Because the roadless area is close to Helena, it is a popular area for big game hunting and provides opportunities for hunting on public lands. The Continental Divide National Scenic Trail runs down the center of the Jericho Mountain roadless area.

26. The Lazyman Gulch roadless area encompasses approximately 11,569 acres. The Lazyman Gulch roadless area is popular for hiking and hunting. Because the roadless area is close to Helena, it is a popular area for big game hunting and provides opportunities for hunting on public lands. The Lazyman Gulch roadless area was recommended for wilderness designation.

9

27. The Jericho Mountain and Lazyman Gulch roadless areas (collectively "the two roadless areas") provide important habitat for big game and other wildlife species. The two roadless areas are important for wildlife movement in the region and are considered by the U.S. Fish and Wildlife Service and Service to be located within an important corridor, or linkage zone, for native wildlife, including wolverine, gray wolves, Canada lynx (lynx), grizzly bears, and big game species. The two roadless areas in the Tenmile project area are important for grizzly bear movement between the Greater Yellowstone Ecosystem and the Northern Continental Divide Ecosystem.

28. According to the Montana Department of Fish, Wildlife and Parks ("Montana"), the Divide landscape and roadless areas are "recognized as crucial wildlife habitat and as a fundamental corridor for the movement of wildlife throughout the region. The importance of the Continental Divide as a genetic conduit through the landscape for rare and uncommon wildlife species cannot be overstated." On June 5, 2008 the Lewis and Clark County Commission adopted Resolution 2008-57 to "Protect and Promote the Conservation of Wildlife Habitat and Corridors on the Continental Divide." According to the Resolution, the

10

"Continental Divide in Lewis and Clark County is home to wildlife populations and wildlands that are treasured and used by Lewis and Clark County's residents." The "Continental Divide represents one of the most critical wildlife corridors in the contiguous United States." In Resolution 2008-57, the Lewis and Clark County Commission formally "recognizes the unique and priceless value of the Continental Divide's wildlife populations and wildlands to residents of Lewis and Clark County."

29. The Service classifies the Divide landscape as a "key linkage area" for wildlife. The Service notes that the Divide landscape is "important [because] it is part of a wildlife linkage zone – sometimes characterized as a travel corridor – through which species such as elk, moose, wolves, grizzly bears, bobcats, lynx, mountain lions, wolverines, and others move between large wildland ecosystems to the north and south." According to the Service, while the entire spectrum of National Forest land in the region provides room for many animals to traverse, it is the wide-array of productive wet sites, i.e., wetlands, seeps, springs, and wet meadows just off both sides of the Continental Divide that "serve[ ] to concentrate a lot of activity in this area."

30. The Divide landscape (and its four roadless areas) provide important habitat and security for big game species, including elk and deer. The Jericho Mountain and Lazyman Gulch roadless areas provide large amounts of hiding and thermal cover and low open-road density. This is, in part, the result of the Service's big game standards included in the 1986 forest plan.

### The Helena National Forest's Big Game Standards

31. The Helena forest plan was adopted in 1986. The forest plan includes standards to ensure habitat and security for big game species, including elk and deer, is protected in the Tenmile project area, including the Jericho Mountain and Lazyman Gulch roadless areas.

32. The forest plan's big game standards were developed with input from wildlife biologists and are based on the best available science. The big game standards were developed with input from state and federal biologists and incorporate over 15 years of research from the Montana Cooperative Elk-Logging Study. The best available science reveals that hiding cover (in addition to other variables, i.e., road density, terrain, hunting pressure, technology) is an important component to maintaining big game habitat and security and

decreasing elk vulnerability during the hunting season. This is especially true in the Helena National Forest where conditions are drier and forest stands less abundant.

33. The forest plans' big game standards have remained in effect for over thirty years. The forest plan's big game standards remain the relevant standards in the Elkhorn Wildlife Management Unit.

34. Compliance with the forest plan's big game standards are measured at the elk herd unit level. An elk herd unit is the total area – including all private, state, and federal lands – used by a herd of elk in the course of one year's movement from summer to winter range.

*Standard 1 – maintain adequate hiding and thermal cover*

35.  Big game standard 1 in the forest plan states that "[o]n important summer . . . and winter range, adequate thermal and hiding cover will be maintained to support habitat potential."

36. The forest plan defines "important summer range" as a range, "usually at higher elevation, used by deer and elk during the summer" and "[m]oist sites often found at the heads of drainages, bordering streams, marshy meadows, swales or benches that are preferred by elk during the summer months (June through September)." The forest plan

defines "winter range" as a "range, usually at lower elevation, used by migratory deer and elk during the winter months."

37. The forest plan defines "thermal cover" as cover "used by animals to ameliorate effects of weather" and includes a "stand of coniferous trees 40 feet or more tall with an average crown closure of 70 percent or more. . ." Thermal cover refers to the *vertical* stand structure and is premised on the amount of "crown closure" in a forest stand (as demonstrated by this photo):



38. The forest plan defines "hiding cover" as "[v]egetation capable of hiding 90 percent of a standing adult deer or elk from the view of a

human at a distance equal to or less than 200 feet, and having a minimum size of 40 acres." Hiding cover refers to the *horizontal* stand structure and is premised on the amount of cover in the understory able to hide a standing elk or deer as viewed horizontally through the forest (as demonstrated by this photo):



Photo Courtesy of EyeInTh

39. Because the forest plan definition of "hiding cover" relies on the amount of horizontal cover, it can only be measured in the field, stand by stand. Green trees and dead or dying trees, including those killed by the mountain pine beetle infestation, still provide important

15

hiding cover for big game species (even if they do not provide good thermal cover). This horizontal definition of "hiding cover" is the only definition of "hiding cover" in the forest plan (with the exception of standard 4a (see below)).

40. The forest plan does not allow the use of a surrogate or proxy for measuring "hiding cover" as defined by the forest plan (with the exception of standard 4a (see below)). The amount of available thermal cover is not a surrogate or proxy for the amount of available hiding cover.

### *Standard 2 – conduct a hiding and thermal cover analysis*

41. Big game standard 2 in the forest plan states that a hiding and thermal cover analysis must be included in an environmental analysis for all project work.

42. The hiding and thermal cover analysis required by standard 2 "should be done on a drainage or elk herd unit basis" and refer to and utilize the recommendations and research findings on how to maintain adequate cover during project work from the "Montana Cooperative Elk-Logging Study" in appendix C of the forest plan.

### Standard 3 – retain hiding and thermal cover

43.  Big game standard 3 in the forest plan states that, subject to hydrologic and other resource constraints, "elk summer range will be maintained at 35 percent or greater hiding cover and areas of winter range will be maintained at 25 percent or greater thermal cover in drainages or elk herd units."

44. The Service measures compliance with standard 3 at the elk herd unit level. The Service measures compliance with standard 3 using the forest plan's definitions of "hiding cover" and "thermal cover."

### Standard 4a – maintain or improve big game security

45. Big game standard 4a in the forest plan is designed to "maintain or improve big game security" by restricting the amount of "open road density" and ensuring sufficient "hiding cover" remains in elk herd units.

46.  The term "big game security" refers to the need to provide secure areas for elk and other big game species from hunters during the fall hunting season (and also from predators).

47. The published literature defines "security" as the protection inherent in any situation that allows big game to remain in a defined

17

area despite an increase in stress or disturbance. Security allows elk and other big game species to remain on public lands and avoid being displaced onto private lands while under stress during the fall hunting season.

48. There are a number of variables that contribute to big game security. These include open road density, the amount of vegetative hiding cover, topography, weather conditions, the timing and duration of the hunting season, hunter numbers, technology, land ownership, and hunting regulations. Security must be determined and mapped by qualified local biologists after taking into consideration all potential variables.

49. Standard 4a in the forest plan uses two variables to maintain and improve big game security on the Helena National Forest: hiding cover and open road density.

50. Under standard 4a, the more hiding cover in the elk herd unit, the more road density allowed. The less hiding cover in the elk herd unit, the less road density allowed.

51. The numeric values designed to maintain big game security under standard 4a are as follows:

| Existing % cover (forest plan) | Existing % cover (Mont.) | Open Road Density |
| --- | --- | --- |
| 56 | 80 | 2.4 miles per square mile |
| 49 | 70 | 1.9 miles per square mile |
| 42 | 60 | 1.2 miles per square mile |
| 35 | 50 | 0.1 miles per square mile |

52. The term "open road density" includes all motorized routes in use during the big game rifle season. Roads are calculated at 100 percent the length of all public roads and 25 percent the length of private roads (this relationship is based on research indicating that roads with less use have reduced impacts to big game).

53. Pursuant to standard 4a, big game security is calculated for all lands (regardless of ownership) within an elk herd unit, including all private lands. Elk and other big game species do not recognize differences in land ownership. Standard 4a takes into account road densities and various types of projects on private lands inside the elk herd unit (ski developments, mining activity, as well as logging, home developments, etc.). Standard 4a takes all motorized routes open during the big game rifle season into account when determining open road density. There are no exemptions for temporary or administrative management activities under standard 4a.

54. The amount of "open road density" allowed pursuant to standard 4a depends on how much "hiding cover" exists within the elk herd unit. The amount of "open road density" allowed pursuant to standard 4a depends on how "hiding cover" is defined for the purposes of standard 4a.

55. Standard 4a is the only standard in the forest plan that allows the Service to use one of two definitions for "hiding cover": the forest plan definition (90 percent of a standing elk at 200 feet – a definition based on the amount of horizontal cover) *or* the Montana Department of Fish and Wildlife's ("Montana's") definition.

56. Montana defines "hiding cover" as "a stand of coniferous trees having a crown closure of greater than 40 percent." Montana's definition of "hiding cover" is similar to the Service's definition of "thermal cover" in the forest plan (a stand of coniferous trees 40 feet or more tall with an average crown closure of 70 percent or more). Both definitions are based on the amount of available "crown closure" in the forest. Both definitions are based on the *vertical* stand structure.

57. Montana's definition of "hiding cover" is derived from Lonner and Cada (1982), an unpublished paper presented at a wildlife

conference in Arizona. On page 6, Lonner and Cada (1982) state without any supporting citation, science, or analysis that "[t]imber stands with at least 40 percent *canopy cover* were considered elk hiding cover." "Canopy cover" discussed in Lonner and Cada (1982) and "crown closure" measured by Montana's definition of "hiding cover" and the Service's definition of "thermal cover" are not synonymous. Canopy cover is the proportion of the forest floor covered by the vertical projection of tree crowns. Crown closure is the proportion of the sky hemisphere obscured by vegetation when viewed from a single point. Montana's definition of "hiding cover" uses "crown closure," not canopy cover.

58. Montana's definition of "hiding cover," which is based on the percentage of crown closure in forest stands, is measured vertically, using aerial photo interpretation and satellite imagery that attempts to measure canopy cover. Canopy cover spatial data used to map "hiding cover" under Montana's definition is derived from R1-VMap.

59. How "hiding cover" is defined and measured for the purposes of standard 4a matters because the numeric values required pursuant to standard 4a differ based on which definition is used.

60. Pursuant to standard 4a, 35 percent horizontal hiding cover as defined by the Service and the existing forest plan is treated as the equivalent of 50 percent vertical hiding cover as defined by Montana.

61. Use of Montana's vertical definition of "hiding cover" is only allowed for the purposes of measuring security under standard 4a.

62. The forest plan does not allow the Service to utilize Montana's vertical definition of "hiding cover" for other big game standards, including standards 1, 2, and 3.

### The Tenmile-South Helena logging project

63.  In December, 2018 the Service signed a record of decision approving the Tenmile project.

64. The Tenmile project area is approximately 60,355 acres in size and is located along the Continental Divide, in the upper Tenmile watershed, just south of Highway 12 (on MacDonald Pass) and southwest of Helena, Montana. Over 50 percent of the project area is located outside the Tenmile watershed. The Tenmile project is within the Helena National Forest's Divide landscape.



65. The Tenmile project implements "Alternative 4" with some adjustments from the final EIS. Alternative 4 and the "adjustments" were not discussed or included in the Service's draft Environmental Impact Statement (EIS) for the Tenmile Project.

66. The Tenmile project will be implemented over approximately 15 years and includes approximately 17,595 acres of logging and prescribed fire. Approximately 11,650 acres of mechanized logging is

23

authorized by the Tenmile project, including nearly 1,000 acres of clearcuts that exceed 100 acres in size.

67. The Tenmile project will result in approximately 11 miles of new, temporary roads. Project operations will also require improvement, maintenance, and use of approximately 18 miles of currently closed roads.

68. The Tenmile project area encompasses two roadless areas on the Helena National Forest: Jericho Mountain and Lazyman Gulch. The Tenmile project authorizes approximately 5,359 acres of logging *within* the roadless areas, including mechanized logging and over 200 acres of clearcuts. The Tenmile-South Helena Forest Restoration Collaborative Committee recommended against allowing mechanized logging within the roadless areas.

69. The Tenmile project will allowing logging inside the roadless areas to clear "private land buffers" 200 yards from private land boundaries. The private land buffers are adjacent to the roadless areas and may or may not include private land structures. There are 15 logging units that will be cleared to 200 yards within the roadless areas. Outside the roadless areas, most of the private land buffers are only 100

yards. The "buffers" in the roadless areas are much larger than what is recommended by the best available science.

70. The Tenmile project authorizes 7 miles of new non-motorized (mountain bike) trails in the Lazyman Gulch roadless area. New non-motorized (mountain bike) trails in the roadless area are not part of the purpose and need of the Tenmile project. New non-motorized (mountain bike) trails in the roadless area were not discussed or disclosed in the draft EIS for the Tenmile project. "Trail" (A) authorized by the Tenmile project is a new, non-motorized trail that will be open to mountain biking. This trail goes through big game habitat and security.

71. "Trail" (B) authorized by the Tenmile project is the historic Chessman Ditch that was used over 100 years ago to transport water to Helena, Montana. Much of the Ditch is not walkable.  The Ditch goes through important wildlife habitat. The Tenmile project will make this Ditch a "trail" and designate it a non-motorized trail open to the public (including mountain biking).

72. In the Lazyman Gulch roadless area, the Service will use, improve, and then stabilize and barrier (not obliterate) approximately 5 miles of roads. The Service will reconstruct old "roads" in the Layzman

Gulch roadless area, including 4000-NS04, 4000-001, and 4000-NS01. These roads will be used for transportation during the project and then left in place but with "barriers." These "roads" have not been used or modified in over 50 years. Roads 4000-NS04, 4000-001, and 4000-NS01 do not exist on the Service's Roads Analysis and maps for the Helena National Forest. "Roads" 4000-NS04, 4000-001, and 4000-NS01 were not system roads.

73. Road 4000-NS04 in the Lazyman Gulch roadless area was not discussed or shown on the Service's maps during scoping for the Tenmile project. Road 4000-NS04 was not shown on the Service's maps in the draft EIS or final EIS. Road 4000-NS04 shows up for the first time in the draft record of decision as an "emergency access route." In the final record of decision, road 4000-NS04 is no longer identified as an "emergency access route" but rather as route slated for "reconstruction, barrier, and stabilization."

74. The Tenmile project includes logging, prescribed fire, and other activities *outside* the two roadless areas. This includes various road activities, watershed projects, prescribed fire, and logging to create

private land buffers. Plaintiffs do not object to and are not challenging these activities occurring outside the two roadless areas.

75. The Tenmile project will occur in three elk herd units: Jericho Mountain; Quartz Creek; and Black Mountain-Brooklyn Bridge. The forest plan uses these three elk herd units to measure the Tenmile project's compliance with the forest plan's big game standards. The Tenmile project will result in a loss of hiding cover for big game. The Tenmile project will result in the loss of thermal cover for big game. The Tenmile project will result the loss of big game security, both during and after project implementation.

76. In approving the Tenmile project, the Service issued a site-specific forest plan amendment to exempt the project from certain forest plan standards, including big game standards in certain elk herd units.

77. In authorizing the Tenmile project, the Service approved a site-specific forest plan amendment that exempts the Tenmile project from eight forest plan standards, including: (1) standard 3's requirement to provide 50 percent hiding cover in the Black Mountain-Brooklyn Bridge elk herd unit; (2) standard 3's requirement to provide 25 percent thermal cover in winter range; (3) standard 4a's big game

27

security requirements in the Black Mountain-Brooklyn Bridge and

Quartz Creek elk herd units; (4) standard 4c's requirement that big

game winter range be closed to vehicles in the winter; (5) standard 6's

requirement that openings created by logging not exceed 100 acres; (6)

standard 6's requirement that logging in winter range occur outside the

winter season; (7) the standard for management area H-1 requiring 25

percent thermal cover on winter range; and (8) the standard for

management area H-2 requiring that 25 percent thermal cover be

provided on winter range (hereinafter the "eight site-specific

amendments").

**FIRST CAUSE OF ACTION**
**(Violation of NFMA – arbitrary determination that exemptions**
**from forest plan standards for big game are minor, non-**
**significant, and "one-time")**

78. Plaintiffs incorporate all preceding paragraphs.

79. Pursuant to NFMA, the Service has the authority to amend

forest plans, including amendments for site-specific projects like the

Tenmile project. 16 U.S.C. § 1604(f)(4). If the amendment results in a

"significant change," then additional analysis and procedures are

required and the Service is required to follow the same process as is

required for the development and adoption of a new forest plan. 36

28

C.F.R. § 219.10(f) (1982). The Service's Forest Service Manual ("FSM") 1926.5 provides guidance on when an amendment is "significant" or not.

80. In authorizing the Tenmile project, the Service approved eight site-specific amendments to the forest plan. The Service determined that these eight site-specific amendments from the forest plan will not compromise the forest plan's goal to maintain and improve big game habitat and security. The Service determined that these eight site-specific amendments are "non-significant." The Service determined that these eight site-specific amendments are only "one-time" exemptions that will not replace existing standards.

81. The Service's determination that these eight site-specific amendments to the forest plan are minor, non-significant, and "one-time," is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or constitutes "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§ 706 (2)(A) and 706 (1).

## SECOND CAUSE OF ACTION
### (Violation of NFMA – improper use of a "security area" concept that conflicts with the forest plan and was previously withdrawn by the Service)

82. Plaintiffs incorporate all preceding paragraphs.

83.  Pursuant to NFMA, all projects – including the Tenmile project – must be consistent with forest plan standards (unless subject to a site-specific amendment that exempts the project from such standards). 16 U.S.C. § 1604(i).

84. Under the forest plan, big game "security" includes both a hiding cover and open road density component. Standard 4a in the forest plan defines "security" for the purposes of the forest plan and includes specific numeric values for providing hiding cover as it relates to open road-density. The more hiding cover, the more open road density allowed. The less hiding cover, the less open road density allowed.

85.  In approving the Tenmile project, preparing maps, and discussing and analyzing the environmental effects of the project in the draft EIS, final EIS, and record of decision, the Service used and applied a new "security area" concept.

30

86. The Service's new "security area" concept includes new terminology like "intermittent refuge areas," "concealment cover," "screening cover," and a new definition of "security" that: (a) removes the hiding cover component; and (b) redefines "open road density" to exclude certain types of roads used for logging, private land access, grazing and other types of uses. The Service's new "security area" concept also excludes consideration of habitat conditions on all non-National Forest System lands (i.e., private, state, county, and BLM) within the elk herd unit.

87. Under this new "security area" concept, big game "security" is defined as "a portion of an elk herd unit that consists of an area of at least 1,000 acres in size that is at least a half mile from a motorized route open to the public between September 1 and December 1 and is at least a half mile from private property." The Service states that "the security definition utilized for the [Tenmile project] does not require that elk security areas provide a particular level of hiding cover . . ." Under this new definition of security, the amount of available hiding cover for elk and other big game species in an elk herd unit is no longer a relevant factor when defining and assessing impacts to "security."

31

Under this new definition of "security," an area devoid of trees (i.e., a clearcut) could qualify as a "security area" so long as it is at least 1,000 acres in size and at least a half mile from a motorized route open to the public. The Service's new "security area" definition does not include a hiding cover component.

88. Under the Service's new "security area" concept, motorized use of roads and routes during the hunting season are not considered "open" if such uses are associated with various "management activities and projects," including logging projects, private land access, grazing and allotment management activities, mining, and other developments authorized by the Service. The Service does not explain why such "administrative" use is exempt from the security standard and would have no impact on big game security.

89. The Service's new "security area" definition and concept is not discussed or mentioned in the forest plan. The Service's new "security area" definition and concept conflicts with the forest plan's definition of "security" and forest plan standard 4a. The Service's "security area" concept and new definition of "security" is confusing, makes it difficult to assess forest plan compliance, allows the Service to "double-count"

hiding cover, and conflicts with how the term is defined and analyzed under the forest plan. The Service's "security area" concept conflicts with the forest plan's big game standards and methods for analyzing and measuring impacts to security.

90. On December 2, 2016, and in response to a legal challenge to the new "security area" concept, *see Montana Backcountry Hunters and Anglers v. U.S. Forest Service*, No. 9:16-cv-00110-DLC (D. Mont. 2016), the Service issued a memorandum expressly withdrawing and disavowing the use of the new "security area" concept pending a revision to the forest plan. In the memorandum, the Service said it would no longer use the "security area" concept and resort to using standard 4a in the forest plan until it completes a revised forest plan. In exchange for this decision, the plaintiffs in *Montana Backcountry Hunters and Anglers* agreed to dismiss their civil action. *See* No. 9:16-cv-00110-DLC (D. Mont. 2016) at Docs. 22, 23. Plaintiffs in this civil action – Helena Hunters and MWF – were also plaintiffs in *Montana Backcountry Hunters and Anglers*.

91. In the final EIS for the Tenmile project, the Service states that although its "security area" concept was withdrawn, the discussion of

elk security . . . contained therein [remains] applicable to the [Tenmile project] since those concepts have been utilized in the [final EIS] analysis." The final EIS uses the "security area" concept to analyze impacts to big game security. Language from the withdrawn "security area" concept is used in the final EIS more than 100 times and used throughout the final record of decision.

92. The Service's decision to use and rely on a new "security area" concept that is confusing, conflicts with the forest plan, and was expressly withdrawn by the Service is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or constitutes "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§ 706 (2)(A) and 706 (1).

## THIRD CAUSE OF ACTION
### (Violation of NFMA – failure to properly define and analyze impacts to "hiding cover" to ensure compliance with big game standards)

93. Plaintiffs incorporate all preceding paragraphs.

94. Pursuant to NFMA, all projects – including the Tenmile project – must be consistent with forest plan standards (unless subject to a site-specific amendment that exempts the project from such standards). 16 U.S.C. § 1604(i).

34

95. The forest plan defines "hiding cover" as "vegetation capable of hiding 90 percent of a standing adult deer or elk from the view of a human at a distance equal to or less than 200 feet." This is the only definition of "hiding cover" in the forest plan. This definition applies to all big game standards in the forest plan, with the exception of standard 4a which gives the Service the discretion to use Montana's definition of hiding cover. Montana's definition of "hiding cover" can only be used for standard 4a. The forest plan does not allow the use of a proxy or surrogate to define hiding cover outside of standard 4a.

96. When evaluating and approving the Tenmile project, including consistency with big game standards, the Service did not apply the forest plan's definition of "hiding cover." The Service did not evaluate whether vegetation capable of hiding 90 percent of a standing deer or elk from view at 200 feet existed in the project area or in units slated for logging and burning.

97. When evaluating and approving the Tenmile project, including consistency with big game standards, the Service arbitrarily used Montana's vertical, crown closure definition instead of the forest plan definition. The Service states that its evaluation and analysis of "hiding

35

cover" is "based on [Montana's] definition of a 'stand of coniferous trees having a crown closure of greater than 40 percent.'" The Service said "hiding cover" will only be based on the amount of "canopy cover." Forest "stands that are greater than 15 years old and meet the requisite canopy cover of at least 40 percent are considered hiding cover."

98. Montana's definition of "hiding cover" conflicts with the forest plan. Montana's definition of "hiding cover" is not premised on the best available science. Montana's definition of "hiding cover" conflates hiding cover with thermal cover. Montana's definition of "hiding cover" is premised on "crown closure," not "canopy cover." Montana's definition of "hiding cover" allows the Service to assume and claim that certain types of logging that removes the understory (but does not affect crown closure) has no adverse impact on hiding cover. Montana's definition excludes forested stands with low amounts of crown closure (less than 40 percent) but high amounts of horizontal cover from "hiding cover."

99. Crown closure is not synonymous with canopy cover. Crown closure is not synonymous with hiding cover. Canopy cover is not synonymous with hiding cover.

36

100. Some forest stands (as illustrated by the photo below) in the Tenmile project area have less than 40 percent crown closure due to loss of overstory from the mountain pine beetle and would not qualify as "hiding cover" under Montana's definition but still provide good horizontal "hiding cover" as defined by the forest plan and the Service:



101. Some forest stands in the Tenmile project area may have more than 40 percent crown closure and qualify as "hiding cover" under Montana's definition but not provide horizontal hiding cover as defined by the forest plan.

102. The Service's use of Montana's definition of "hiding cover" is sometimes used in conjunction with the forest plan definition. The

Service sometimes uses the forest plan and Montana definitions of "hiding cover" in conjunction with its new "security area" concept. The Service uses and combines the two definitions and "security area" concept and sometimes double counts the amount of available "hiding cover."

103. Big game standard 1 in the forest plan requires the Service to maintain adequate "hiding cover" on important summer and winter range. The Service cannot evaluate and analyze compliance with standard 1 in the forest plan unless and until it properly defines and applies the forest plan's definition of "hiding cover" to the units and avoids mixing and matching the two definitions. Standard 1 is not subject to the Service's site-specific forest plan amendment for the Tenmile project.

104. Big game standard 2 in the forest plan requires the Service to conduct a hiding and thermal cover analysis for all project work. The Service cannot conduct a hiding cover analysis as required by standard 2 unless and until it properly defines and applies the forest plan's definition of "hiding cover" and avoids mixing and matching the two

definitions. Standard 2 is not subject to the Service's site-specific forest plan amendment for the Tenmile project.

105. Big game standard 3 in the forest plan requires the Service to maintain at least 35 percent hiding cover in elk summer range. The Service cannot evaluate and analyze compliance with standard 3 unless and until it properly defines and applies the forest plan's definition of "hiding cover" and avoids mixing and matching the two definitions. Standard 3 is subject to the Service's site-specific forest plan amendment for the Tenmile project but only in the Black Mountain-Brooklyn Bridge herd unit. Standard 3 is not subject to the Service's site-specific amendment for the Tenmile project in the Jericho Mountain and Quartz Creek elk herd units.

106. The Service's decision and/or failure to use the forest plan's definition of "hiding cover" when authorizing the Tenmile project, and failure to ensure consistency with big game standards and decision to rely instead on Montana's definition, is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or constitutes "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§ 706 (2)(A) and 706 (1).

39

## FOURTH CAUSE OF ACTION
## (Violation of NFMA – failure to properly define "open road" density for standard 4a)

107. Plaintiffs incorporate all preceding paragraphs.

108. Pursuant to NFMA, all projects – including the Tenmile project – must be consistent with forest plan standards (unless subject to a site-specific amendment that exempts the project from such standards). 16 U.S.C. § 1604(i).

109. Standard 4a requires the Service to comply with specific hiding cover and open road density standards. Standard 4a is subject to the Service's site-specific forest plan amendment for the Tenmile project but only in the Black Mountain-Brooklyn Bridge and Quartz Creek elk herd units. No site-specific amendment applies to the Jericho Mountain elk herd unit.

110. The Service estimates there to be approximately 25,810 acres of hiding cover (approximately 73 percent) in the Jericho Mountain elk herd unit, based on Montana's definition. The Service estimates this will drop to 21,939 acres of hiding cover (approximately 62 percent) after implementation of the Tenmile project.

40

111. Pursuant to standard 4a, the maximum road density allowed in the Jericho elk herd unit is approximately 1.2 miles per square mile.

112. Pursuant to standard 4a, "open road density" includes all motorized routes in use during the big game rifle season. Roads are calculated at 100 percent the length of all public roads and 25 percent the length of private roads (this relationship is based on research indicating that roads with less use have reduced impacts to big game).

113. In authorizing the Tenmile project, and evaluating compliance with standard 4a, the Service did not properly determine the "open road density" for the Jericho elk herd unit. The density estimates differ from other estimates made by the Service when approving other projects or actions in the Jericho elk herd unit. In authorizing the Tenmile project, the Service did not properly define "open road density" as required by the forest plan. The Service only considered roads "open" for the purposes of standard 4a if the motorized route is "open to the public." The Service never considered and accounted for roads that are open for logging trucks or other management or administrative purposes (but otherwise closed to the public) when assessing compliance with standard 4a. If the Service had

41

properly defined "open road density" under the forest plan, then the Tenmile project would violate standard 4a. In authorizing the Tenmile project, the Service also applied estimates of the amount of available hiding cover in the Jericho Mountain elk herd unit that differ from the Service's previous estimates and estimates the Service used to approve other projects in the same elk herd unit.

114. The Service's failure to properly define and account for open road density for the purposes of evaluating compliance with standard 4a and conflicting hiding cover estimates in the Jericho Mountain elk herd unit is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or constitutes "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§ 706 (2)(A) and 706 (1).

## FIFTH CAUSE OF ACTION
### (Violation of the Roadless Rule)

115. Plaintiffs incorporate all preceding paragraphs.

116.  Pursuant to the Roadless Rule, the Service may not construct and/or reconstruct a road within an inventoried roadless area, unless the Service can document and demonstrate that the construction or reconstruction falls within an exception. 36 C.F.R. §§ 294.12(a),(b).

117. The Service's Tenmile project authorizes road construction and/or reconstruction in the Jericho Mountain and Lazyman Gulch roadless areas. This road construction and/or reconstruction does not fall within an exception allowed by the Roadless Rule and the Service has failed to document and demonstrate that such an exception exists.

118. Pursuant to the Roadless Rule, the Service is prohibited from authorizing timber cutting, sale, or removal within inventoried roadless areas, unless the Service can document and demonstrate that the timber cutting, sale, or removal falls within an exception. 36 C.F.R. §§ 294.13(a),(b).

119. The Service's Tenmile project authorizes timber cutting, sale, and removal in the Jericho Mountain and Lazyman Gulch roadless areas. This timber cutting, sale, and removal does not fall within an exception allowed by the Roadless Rule and the Service has failed to document and demonstrate that such an exception exists.

120. The Service's decision to authorize road construction, road reconstruction, and timber cutting, sale, and removal in the Jericho Mountain and Lazyman Gulch roadless areas violates the Roadless Rule and is "arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law" and/or constitutes "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§ 706 (2)(A) and 706 (1).

## SIXTH CAUSE OF ACTION
### (Violation of NEPA – failure to analyze Tenmile and Telegraph projects in same EIS)

121.  Plaintiffs incorporate all preceding paragraphs.

122. Pursuant to NEPA, the Service is required to include all "cumulative actions, which when viewed with other proposed actions have cumulatively significant impacts" in the same EIS. 40 C.F.R. § 1508.25(a)(2). A cumulative impact is defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions . . . Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

123. The Telegraph Vegetation project ("Telegraph project") includes logging, road work, and related activities on 5,678 acres. The Telegraph project will remove approximately 1,989 acres of hiding cover in the Jericho Mountain elk herd unit. The Telegraph project will

construct approximately 1.4 miles of temporary road and use another 12 miles of currently closed roads in the Jericho Mountain elk herd unit. The Jericho Mountain elk herd unit overlaps with the Tenmile project.

124. The Telegraph and Tenmile projects are cumulative actions. The Telegraph and Tenmile project will occur during the same time period. The Telegraph and Tenmile projects are both in the Helena National Forest and within the Divide landscape. The Telegraph and Tenmile projects are adjacent to one another. The Telegraph and Tenmile projects will occur in the same elk herd unit (Jericho Mountain). The Telegraph and Tenmile projects will occur in the same roadless area (Jericho Mountain). The Telegraph and Tenmile projects will cumulatively impact roadless values in the Jericho Mountain roadless area. The Telegraph and Tenmile projects will cumulatively impact big game habitat and security in Jericho Mountain elk herd unit. Some units within the Telegraph project that are adjacent to the Tenmile project will cumulatively result in large forest openings that exceed 100 acres in size.

125. Together, the Telegraph and Tenmile projects will reduce the amount of available big game habitat and security in the Jericho

Mountain elk herd unit. Together, the Telegraph and Tenmile projects will reduce the amount of hiding cover in the Jericho Mountain elk herd unit below the 35 percent threshold allowed by forest plan standard 3. Together, the Telegraph and Tenmile projects will reduce big game security below the numeric thresholds allowed in forest plan standard 4a. Together, the Telegraph and Tenmile projects will result in violations of forest plan standards, including standard 6.

126. The Service's decision and/or failure to evaluate and analyze the Telegraph and Tenmile projects in the same EIS (or same NEPA document) is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or constitutes "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§ 706 (2)(A) and 706 (1).

## SEVENTH CAUSE OF ACTION
**(Violation of NEPA – failure to analyze cumulative effects to big game habitat and security and roadless areas)**

127. Plaintiffs incorporate all preceding paragraphs.

128. Pursuant to NEPA, the Service is required to take a hard look at cumulative effects.  A cumulative effect is defined as "the impact on the environment which results from the incremental impact of the

action when added to other past, present, and reasonably foreseeable future actions . . . Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

129. In authorizing the Tenmile project, the Service failed to evaluate and analyze how all aspects of the Tenmile project (i.e., the logging, road work (including road reconstruction in the roadless areas), prescribed burning, new mountain bike trails, as well as the eight sight-specific amendments to the forest plan), in combination with other past, present, and reasonably foreseeable activities and projects and site-specific amendments in the area may cumulatively impact big game habitat and security and the roadless area values.

130. The Service's failure to evaluate and analyze the cumulative effects of the Tenmile project is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or constitutes "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§ 706 (2)(A) and 706(1).

## EIGHTH CAUSE OF ACTION
### (Violation of NEPA – no "security area" analysis and misleading EIS)

131. Plaintiffs incorporate all preceding paragraphs.

132. NEPA requires the Service take a hard look at the direct, indirect, and cumulative impacts of its proposed action (all aspects). 40 C.F.R. §§ 1502.16, 1508.7, 1508.8. NEPA requires the Service analyze a reasonable range of alternatives to a proposed action. 40 C.F.R. § 1502.14.

133. NEPA's procedures "must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. § 1500.1. The information presented in an EIS "must be of high quality." *Id.* "Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." *Id.* An EIS "shall inform decision makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

134. The draft EIS and final EIS includes a new definition for "security" and new "security area" concept to evaluate and analyze

48

impacts to big game and ensure compliance with forest plan standards. Terms, including "security area," "intermittent refuge areas," "concealment cover," and "screening cover," and additional language from the withdrawn "security area" concept is used in the final EIS more than 100 times and used throughout the record of decision. The draft EIS and final EIS also include maps depicting the new "security areas" in relation to the Tenmile project.

135. The Service never analyzed the direct, indirect, or cumulative impacts of its "security area" concept in the draft EIS or final EIS for the Tenmile project as required by NEPA. The Service never analyzed reasonable alternatives to the "security area" concept in the draft EIS or final EIS for the Tenmile project as required by NEPA. The "security area" concept conflicts with the best available science.

136. The new "security area" concept discussed and analyzed in the draft EIS and final EIS and record of decision is not included in the forest plan or consistent with how "security" and big game habitat is defined and analyzed in the forest plan. The final EIS inappropriately intimates and portrays to the public that the "security area" concept and the existing security standard in the forest plan are analogous. The

49

final EIS confuses the public by using and referencing the "security area" concept and existing forest plan standard for security. The new "security area" concept discussed and analyzed in the draft EIS and final EIS undermines the public's ability to make an informed comparison of alternatives and assess the environmental impacts of the decision. The new "security area" concept in the draft EIS and final EIS is confusing to the public, makes it difficult to assess forest plan compliance and impacts to big game habitat and security, allows the Service to "double-count" hiding cover, and undermines the public's ability to submit meaningful comment.

137. The Service's failure to analyze the impacts (direct, indirect, and cumulative) of and reasonable alternatives to its "security area" concept and confusing, incorrect, and misleading EIS for the Tenmile project is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or constitutes "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§ 706 (2)(A) and 706(1).

### NINTH CAUSE OF ACTION
### (Violation of NEPA – failure to prepare supplemental EIS)

138. Plaintiffs incorporate all preceding paragraphs.

139. NEPA requires the Service to prepare "supplements" to either a draft EIS or final EIS if the "agency makes substantial changes in the proposed action that are relevant to environmental concerns." 40 C.F.R. § 1502.9(c). If required, a supplemental EIS shall be prepared, circulated, and filed in the "same fashion (exclusive of scoping) as a draft and final [EIS] . . ." *Id.*

140. The Service's decision to authorize: (a) road construction and/or reconstruction in the Lazyman Gulch roadless area, including (but not limited to) routes 4000-NS004 and 4000-NS001; and (b) new mountain bike trails in the Lazyman Gulch roadless area – an area recommended for wilderness designation – including (but not limited to) Trails A, B, and D, are substantial changes to the proposed action that were never discussed or addressed in the draft EIS.

141. The Service's final decision – Alternative 4 – which authorizes new road construction and/or reconstruction and mountain bike trails in the Lazyman Gulch roadless area was never discussed, analyzed, or disclosed in the draft EIS. The Service's decision to authorize new road construction and/or reconstruction and new mountain bike trails in the Lazyman Gulch roadless area is not a

"minor variation" from the proposed action discussed in the draft EIS. The Service's decision to authorize new road construction and/or reconstruction and mountain bike trails in the Lazyman Gulch roadless area does not meet the purpose and need of the Tenmile project. The Service's decision to authorize new road construction and/or reconstruction and new mountain bike trails in the Lazyman Gulch roadless area is not qualitatively within the spectrum of alternatives included and discussed in the draft EIS.

142. The Service's decision to authorize new road construction and/or reconstruction and new mountain bike trails in the Lazyman Gulch roadless area triggers the need for a supplemental EIS.

143. Instead of preparing a new, supplemental EIS as required by NEPA, the Service engaged in two public "check in" comment periods to adopt a new decision (Alternative 4). The two public "check in" comment periods are not the equivalent of a supplemental EIS. The two public "check in" comment periods are not authorized by NEPA.

144. The Service's decision and/or failure to prepare a supplemental EIS for the Tenmile project is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or

constitutes "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§ 706 (2)(A) and 706(1).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request this Court:

A.  Declare the Service has violated and continues to violate the law as alleged above;

B.  Remand this matter back to the Service with instruction to comply with NEPA, NFMA, and the Roadless Rule as alleged above;

C. Set aside the Service's decision approving all logging, road construction and/or reconstruction, and new mountain bike trails inside the two roadless areas, as authorized by the Tenmile project, pending compliance with the law;

D.  Award Plaintiffs their reasonable attorneys' fees, costs and expenses of litigation pursuant to the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412;

E. Issue any other relief, including preliminary or permanent injunctive relief that Plaintiffs may subsequently request.

F.  Issue any other relief this Court deems necessary, just, or proper.

Respectfully submitted this 19th day of March, 2019.

/s/ Matthew K. Bishop
Matthew K. Bishop

/s/ Kelly E. Nokes
Kelly E. Nokes

*Counsel for Plaintiffs*