IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

**FILED**

JUL 01 2020

Clerk, U.S Courts
District Of Montana
Missoula Division

| | |
|---|---|
| HELENA HUNTERS AND ANGLERS ASSOCIATION, and MONTANA WILDLIFE FEDERATION, | CV 19–47–M–DLC |
| Plaintiffs, and | (Consolidated with Case No. CV 19–106–M–DLC) |
| ALLIANCE FOR THE WILD ROCKIES, and NATIVE ECOSYSTEM COUNCIL | ORDER |
| Consolidated Plaintiffs, | |
| vs. | |
| LEANNE MARTEN, in her official capacity; UNITED STATES FOREST SERVICE; UNITED STATES DEPARTMENT OF AGRICULTURE, | |
| Federal Defendants, and | |
| STATE OF MONTANA, and MONTANA BICYCLE GUILD | |
| Defendant-Intervenors. | |

Before the Court are Plaintiffs Alliance for the Wild Rockies and Native

Ecosystems Council's (collectively, "Alliance") Motion for Summary Judgment

(Doc. 43); Plaintiffs Helena Hunters and Anglers Association and Montana

Wildlife Federation's (collectively, "Helena Hunters") Motion for Summary

–1–

Judgment (Doc. 55); Federal Defendants' Cross Motion for Summary Judgment (Doc. 63); Defendant-Intervenor Montana Bicycle Guild, Inc.'s Cross Motion for Summary Judgment (Doc. 66); and Helena Hunters' motions to supplement the administrative record (Doc. 54; 95). For the reasons explained, Helena Hunters' motions to supplement will be granted in part and denied in part. The Court agrees with Helena Hunters that the Forest Service's authorization of the Tenmile-South Helena Project ("Project") violates the Roadless Rule, the National Environmental Policy Act ("NEPA"), and the Administrative Procedure Act ("APA"). Alliance prevails on its claim that the Project violates the ESA because the Biological Opinion failed to address the Project's addition of recreational trails.

## BACKGROUND

The Tenmile-South Helena Project encompasses roughly 60,000 acres south and west of Helena, Montana. AR 006014–15. Much of the Project is located within two inventoried roadless areas ("IRAs"), the Jericho Mountain IRA and Lazyman Gulch IRA, which serve as biological strongholds for elk and grizzly bears. AR 006014, 007077. The eastern half of the Project is characterized by lower elevation grasslands and forests of dry Douglas fir and ponderosa pine. AR 006016. The western half is characterized by higher elevation forests of lodgepole pine, and Douglas and subalpine firs. *Id.*

In 2009, a mountain pine beetle outbreak caused extensive mortality across

the forest. *Id.* Most of the trees have already fallen, but 20 to 30% remain standing and are expected to fall within the next few years. AR 006204. The dead trees make the area particularly susceptible to wildfire and pose risks to firefighter safety. AR 006217.

The eastern half of the Project falls within the Tenmile watershed which supplies Helena with most of its water needs. AR 006017. The infrastructure to collect and treat this water was initially constructed in 1880 with an addition in 1921. (Doc. 52-1 at 5–6.) The Tenmile System is now outdated and deteriorating, making it particularly vulnerable to fire damage. (*Id.* at 7.) Helena is in the process of making a sizable investment to upgrade the system, (*id.* at 8), and the Tenmile Project seeks to protect that investment by reducing fuels and creating fire breaks to mitigate the size of a possible fire and the soil erosion that would inevitably follow, AR 006017.

Given the Tenmile Project's important goals and characteristics, a collaborative planning group of community stakeholders formed in 2008 to make recommendations to the Forest Service on how to best accomplish the Project's purposes. AR 020778. The committee specifically recommended against using "heavy or mechanized equipment," in the roadless areas, AR 008266, because mechanized equipment requires a developed transportation system. During the scoping process, and in the draft environmental impact statement ("EIS"), the

–3–

Forest Service did not discuss using mechanized equipment to log the roadless areas. The draft EIS included a discussion of three alternatives (a no action alternative and two action alternatives) but neither of the action alternatives contemplated any mechanized logging, road construction or maintenance in the Lazyman Gulch IRA.

In September of 2016, after release of the draft EIS, the Forest Service began developing another action alternative. Unlike the prior alternatives, alternative four proposed mechanized logging within the Lazyman Gulch. Although roadless areas prohibit new road construction, *see* Special Areas; Roadless Area Conservation, 66 Fed. Reg. 3244, 3245 (Jan. 12, 2001), the Lazyman landscape contains historic remnants of long-abandoned trails and two-tracks, which were developed in the late 1880s for mining, homesteading, and logging purposes. (*See* Doc. 54-1); AR 005647. These more-than-hundred-year-old routes have never been recognized as "system" roads by the Forest Service, and, after decades of nonuse, they are largely overgrown. (*See* Doc. 54-1.) Using these historic routes is central to alternative four and, in the Forest Service's mind, avoids the need for road construction.

According to meeting notes from September 2016, a team of Forest Service employees tasked with developing alternative four informed their supervisor that they needed additional time to assess the "truth" of the conditions on the ground to

-4-

"validate" that the "existing trails, roads, and tracks" were suitable for transporting heavy equipment. AR 010426. A month later, this team met again. AR 010430. The notes from this meeting indicate that the team had "identified numerous two track routes" that could be used for transporting mechanized equipment but still needed to walk the area to inventory these historic features, and that this would "not be a quick and simple process." *Id.* The supervising ranger informed the team that this was "not urgent." *Id.* The notes indicate that the team's immediate goal was to "get the user created routes and old mining trails to GIS" to update the road list for alternative four, with the ultimate goal of releasing this information for public comment in just a few weeks' time. AR 010431, 010427. This map was finished a month later. *See* AR 010705. The Forest Service released its summary of alternative four in two public "check-ins." AR 015011, 015077. Then, in August of 2017, the Forest Service released the final EIS, selecting alternative four as the preferred alternative. AR 006011.

In December of the same year, in preparation for release of the draft Record of Decision, the team struggled with how to present the roadwork in the Lazyman Gulch.[1] In an email chain with the Forest Ranger supervising the Project, one

---

[1] Evidence of this comes from an email chain that was submitted to Helena Hunters as part of the administrative record but was not Bates stamped. Email from Mary Smith, U.S. Forest Service to Elaina Graham, U.S. Forest Service, Notes on ROD Transportation Layer (December 07, 2017 12:32 p.m. MTN) (copy on file with the Forest Service).

employee noted that making use of some of the non-system roads would require either temporary road construction or reconstruction. After reviewing the team's recent work on the mapping software, this employee noted that much of the roadwork on the current draft had been minimized from the original draft.[2] For example, some roads that required reconstruction were listed as requiring only maintenance, whereas others had been changed from new construction to reconstruction. Next to Road 4782-003, a non-system road in the roadless area, the employee indicated that she wasn't sure how to display the roadwork because classifying it as temporary road construction would cause problems. In response, the Forest Ranger instructed her to meet with a supervising employee who would get her up to speed on how to display the intended work. In the end, the final EIS does not display any intended road treatments in the roadless areas. Instead, it indicates only the methods by which various roads will be closed at Project completion.

In December 2018, the Acting Forest Supervisor signed the Record of Decision, approving the Project, and selecting alternative four with a few modifications. AR 009171. As for transportation in the roadless area, alternative four uses 1.7 miles of system roads that predate the Lazyman Gulch's designation as a roadless area. AR 007052. In addition, it makes use of other existing historic

---

[2] Another employee clarified that these changes resulted from a "procedural snafu."

routes. AR 009185. The Forest Ranger recognized that the activities proposed in the roadless areas are controversial; nevertheless she "felt [using mechanized equipment] is essential to provide safe conditions for forest workers and . . . can be conducted with minimal resource impacts." *Id.* She emphasized that "[d]uring project activities, no improvements such as reconstruction will occur to [the historic routes], although there may be a need to clear debris such as rocks and downed trees from the routes in order to provide safe and efficient access for crews and mechanized equipment during implementation." *Id.*

In its final form, the Project proposes treatment activities including over 17,000 acres of logging—including 2,000 acres of mechanized logging in the Lazyman Gulch IRA—prescribed burn, and roadwork. AR 009178, 009181. The Project will close 14 miles of non-system roads in the Lazyman Gulch IRA and add a network of recreational trails in and around the roadless area. AR 007052, 006210.

Helena Hunters and Alliance filed suit on March 19, 2019 and June 20, 2019, respectively. On July 11, 2019, the Court consolidated their cases. (Doc. 17.) Alliance moved for a preliminary injunction which the Court denied. (Docs. 24, 57.) The parties subsequently filed cross motions for summary judgment, and on March 18, 2020, the Court held a hearing on those motions.

Despite the limited nature of judicial review under the APA, which generally

-7-

bars a court from considering information outside the administrative record, the Court asked the parties at the hearing whether this case presented a factual dispute pertaining to the condition of the existing roads in the Lazyman Gulch IRA. In response, all parties maintained the case could be resolved on the existing record. The Court continued to believe that the record was insufficient to resolve the issue of road use in the Lazyman Gulch IRA, due in large part to the Forest Service's steadfast representation in its briefing that "no road construction or reconstruction will occur," (Doc. 62 at 2; *accord* 65 at 25–26; 88 at 7–9; 96 at 2; 110), which the Court now finds to be false, or at best, a gross misrepresentation. Thus, on April 24, 2020, the Court ordered the parties to further develop the factual record. (Doc. 105.) On May 29, 2020, Helena Hunters and the Forest Service complied, submitting hundreds of pages of additional information. (Docs. 108, 109.)

## LEGAL STANDARDS

### I.   The National Environmental Policy Act

The National Environmental Policy Act ("NEPA") "has twin aims. First, it places upon [a federal] agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1066 (9th Cir. 2002) (quoting *Baltimore Gas & Elec. Co. v. Nat. Res. Def.*

*Council, Inc.*, 462 U.S. 87, 97 (1983) (internal quotations and citations omitted)).

"NEPA is a procedural statute that does not mandate particular results but simply

provides the necessary process to ensure that federal agencies take a hard look at

the environmental consequences of their actions." *High Sierra Hikers Ass'n v.*

*Blackwell*, 390 F.3d 630, 639–40 (9th Cir. 2004) (internal citations and quotation

marks omitted); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351

(1989) ("[NEPA] prohibits uninformed—rather than unwise—agency action").

NEPA requires an agency to prepare an EIS for any proposed action

"significantly affecting the quality of the human environment." 42 U.S.C.

§ 4332(2)(C). The NEPA process requires the agency to first prepare a draft EIS

to submit for public review and comment. 40 C.F.R. § 15402.9(a). NEPA also

allows the agency to modify its projects in light of public input, but if the

modification "departs substantially from the alternatives described in the draft

EIS," the agency must prepare a supplemental draft EIS. *Russell Country*

*Sportsmen v. U.S. Forest Serv.*, 668 F.3d 1037, 1045 (9th Cir. 2011).

## II.    The National Forest Management Act

The National Forest Management Act ("NFMA") requires forest planning of

national forests at two levels: the forest level and the individual project level. 16

U.S.C. §§ 1600–1687. At the forest level, NFMA directs the Department of

Agriculture to "develop, maintain, and, as appropriate, revise [forest plans] for

units of the National Forest System." 16 U.S.C. § 1604(a). A forest plan sets

broad guidelines for forest management and serves as a programmatic statement of

intent to guide future site-specific decisions within a forest unit. *Citizens for Better*

*Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 966 (9th Cir. 2003); *Ohio Forestry*

*Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 729 (1998). Forest plans must "provide

for multiple use and sustained yield of the products and services" derived from the

national forests, including "outdoor recreation, range, timber, watershed, wildlife

and fish, and wilderness." 16 U.S.C. § 1604(e)(1). At the individual project level,

NFMA requires that each individual project be consistent with the governing forest

plan. *Great Old Broads for Wilderness v. Kimbrell*, 709 F.3d 836, 851 (9th Cir.

2013).

The Forest Service's interpretation and implementation of its own forest

plan is entitled to substantial deference. *Forest Guardians v. U.S. Forest Serv.*,

329 F.3d 1089, 1099 (9th Cir. 2003). This deference may be set aside only where

an agency takes a position that is "contrary to the clear language" of the forest

plan. *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 962 (9th Cir.

2005).

## III.  The Endangered Species Act

The Endangered Species Act ("ESA") "requires the Secretary of the Interior

to promulgate regulations listing those species of animals that are 'threatened' or

-10-

'endangered' under specified criteria, and to designate their 'critical habitat.'"
*Bennett v. Spear*, 520 U.S. 154, 157–58 (1997) (quoting 16 U.S.C. § 1533). The
ESA also requires each federal action agency to ensure that an agency action is not
likely to "jeopardize the continued existence" of a threatened or endangered
species. 16 U.S.C. § 1536(a)(2).

To this end, the ESA's implementing regulations outline a detailed process
to ensure that the action agency—here, the Forest Service—consults with an
appropriate expert agency—here, FWS. The Forest Service's first step in
complying with Section 7 is to obtain from FWS "a list of any listed or proposed
species or designated or proposed critical habitat that may be present in the action
area." 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12(c)–(d). If FWS advises that
these species or their habitat "may be present," the Forest Service must complete a
biological assessment to determine if the proposed action "may affect" or is "likely
to adversely affect" the listed species. 16 U.S.C. § 1536(c)(1); 50 C.F.R.
§§ 402.12(f), 402.14(a), (b)(1); *Forest Guardians v. Johanns*, 450 F.3d 455, 457
(9th Cir. 2006).

If the Forest Service determines that an action "may affect" a listed species,
the Forest Service must consult with FWS. *Karuk Tribe of Cal. v. U.S. Forest
Serv.*, 681 F.3d 1006, 1027 (9th Cir. 2012). During formal consultation, FWS
must "[f]ormulate its biological opinion as to whether the action, taken together

–11–

with cumulative effects, is likely to jeopardize the continued existed of a listed

species or result in the destruction or adverse modification of critical habitat." 50

C.F.R. § 402.14(g)(4). The biological opinion must include a detailed discussion

of the effects of the action and a determination of whether the action likely would

jeopardize the continued existence of a listed species. *Id.* § 402.14(h). FWS's

issuance of a biological opinion terminates formal consultation. *Id.*

§ 402.14(m)(1).

## IV.    The Roadless Rule

In 2001, the Forest Service promulgated the Roadless Area Conservation

Rule ("Roadless Rule") restricting road construction and logging in specifically

designated roadless areas on national forest lands. 66 Fed. Reg. at 3245. "[I]n an

odd semantic twist," not all of the inventoried roadless areas are, in fact, roadless

as some designated areas contained preexisting roads. *Kootenai Tribe of Idaho v.*

*Veneman*, 313 F.3d 1094, 1104 (9th Cir. 2002) *abrogated by Wilderness Soc. v.*

*U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011). Otherwise, roadless areas are

"large, relatively undisturbed landscapes" that offer a "variety of scientific,

environmental, recreational, and aesthetic attributes and [unique] characteristics, . .

. [which are] referre[d] to as 'roadless values'." *Organized Vill. of Kake*, 795 F.3d

at 959 (quoting 66 Fed. Reg. at 3245, 3251). Montana is home to the second

largest body of roadless areas in the lower forty-eight, with over six million acres

of its national forest land protected by this designation.  David Stewart, *Creating the New American Wilderness in America's "Untrammeled" Backcountry: The Roadless Area Conservation Rule and the Ninth Circuit*, 28 Okla. City U. L. Rev. 829, 837 (2003).  Absent certain exceptions, the Roadless Rule prohibits new construction or reconstruction of roads in inventoried roadless areas.  66 Fed. Reg. at 3272.

## V.    Summary Judgment

When a district court reviews an agency decision, summary judgment is the "appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did." *City & Cty. of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir. 1997) (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 770 (9th Cir. 1985)).  Generally summary judgment is appropriate when "there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Once the moving party demonstrates summary judgment is appropriate, the burden shifts to the opposing party to show why summary judgment is not proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In an APA case, however, the summary judgment standard is modified by the APA.  The burden shifting framework is inapplicable as the burden always remains with the plaintiff. *Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest*

-13-

*Serv.*, 305 F.R.D. 256, 281 (D.N.M. 2015). And, because a court's review is limited to the record (absent narrow exceptions), the typical case does not involve factual disputes. *Hispanic Affairs Project v. Acosta*, 263 F. Supp. 3d 160, 171 (D. D.C. 2017), *overruled in part on nonrelevant grounds by Hispanic Affairs Project v. Acosta*, 901 F.3d 378 (D.C. Cir. 2018). Even when the administrative record is supplemented, a court will not overturn an agency's decision unless it is arbitrary and capricious. *Rochling v. Dep't of Veterans Affairs*, 725 F.3d 927, 936 (8th Cir. 2013).

> Under this standard:

> [A]n agency must examine the relevant data and articulate a satisfactory explanation for its action. An agency's action is arbitrary and capricious if the agency fails to consider an important aspect of a problem, if the agency offers an explanation for the decision that is contrary to the evidence, if the agency's decision is so implausible that it could not be ascribed to a difference in view or be the product of agency expertise, or if the agency's decision is contrary to the governing law.

*Organized Vill. of Kake v. U.S. Dep't of Agric.*, 746 F.3d 970, 974 (9th Cir. 2014) (internal citation and quotation marks omitted).

While the APA requires a "thorough, probing, in-depth review" of agency action, *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971) *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977), the standard of review is nonetheless "highly deferential," *Nw. Ecosystem All. v. U.S. Fish and Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007). If the court finds the

-14-

existence of a reasonable basis for the agency's decision, it must presume the validity of, and affirm, the agency action. *Id.*

DISCUSSION

Helena Hunters claims that the Project violates the Roadless Rule, NEPA, NFMA, and APA because: (1) the Forest Service plans to construct new roads in the Lazyman Gulch IRA; (2) the Forest Service failed to prepare a supplemental EIS when its chosen alternative was more than a minor deviation from the alternatives discussed in the draft EIS; and (3) the Forest Service's use of the old elk security amendment and incorrect definition of hiding cover violates NFMA. (Doc. 56.)

Alliance claims the Tenmile Project violates NEPA, ESA, NFMA, and APA because: (1) the Forest Service failed to prepare a single EIS for the Tenmile and Telegraph Projects when the Projects amount to a single course of action with significant cumulative effects; (2) the Biological Opinion is insufficiently detailed; and (3) the Forest Service violated the Forest Plan by authorizing treatments that would exceed open road density in occupied grizzly bear habitat.  (Doc. 45.)

## I.      Helena Hunters' Claims

Helena Hunters primarily challenges the activities planned in the Lazyman Gulch IRA.  Despite the Forest Service's statement that the Project "does not propose any new road construction or road reconstruction in the roadless expanse,"

–15–

AR 007039, Helena Hunters insists that the Project violates the Roadless Rule because the Forest Service is surreptitiously planning prohibited roadwork.  (Doc. 56 at 17–19.)  Noting its failure to discuss the existing road conditions in the administrative record, Helena Hunters argues that the Forest Service's plan to bring heavy mechanized equipment into the roadless area requires it to construct suitable transportation routes.  They believe that evidence of the Forest Service's true intent can be found in its promise to close over 14 miles of unauthorized roads; because these roads are already closed, the Forest Service must intend to construct temporary roads during the Project's lifespan.  (*Id.* at 20–23.)

Federal Defendants insist that no road construction (or reconstruction) is intended—or necessary—because the Forest Service will utilize existing routes with "small vehicles" ("such as a track forwarder or a Utility Task Vehicle") capable of primitive travel along these routes.  (Doc. 65 at 25–26.)  Elsewhere, the final EIS asserts that "no treatment" is needed, not even "maintenance."  *See* AR 007007.  Yet, the Forest Service concedes that "there may be a need to clear debris such as rocks and down trees from the routes[.]"  AR 009181.

Given the deference due to agency decisionmaking on matters within the agency's expertise, *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 798 (9th Cir. 2005), Helena Hunters recognizes that its claim only gains traction if the Court reviews evidence regarding the current condition of the

intended transportation routes in the Lazyman Gulch IRA, and moves to supplement the record with two declarations. (Docs. 54, 95.) Before turning to the merits, the Court will address these motions and the Court's order to develop the record.

## A. Supplementation of the Administrative Record

### 1. Background

Helena Hunters submits two declarations from founding Helena Hunters and Anglers member, Gayle Joslin. (Doc. 54-1.) In her 32-year career as a wildlife biologist for Montana Fish, Wildlife, and Parks, Joslin spent nearly twenty years working in the Lazyman area and has lived within a half mile of the area for more than 50 years. (*Id.* at 1–2.) After reviewing the Record of Decision, Joslin was skeptical of the Forest Service's claim that no new roads would be constructed in the Lazyman Gulch IRA, and that all mechanized logging could be accomplished utilizing "existing" routes on the landscape. (*Id.* at 3, 7–8.) Joslin's first declaration records her observations of the on-the-ground conditions, including numerous pictures of the landscape that correspond with the Tenmile Project's "Transportation Plan and Route Closure Methods Maps." (*Id.* at 5, 9–25.)

In her subsequent declaration, submitted by Helena Hunters as a "notice of supplemental authority," Joslin documents recent Project activities. (Doc. 95-1.) In early spring, Joslin was walking on the outskirts of the roadless area when she

came across a segment of newly constructed road leading to the Lazyman
boundary. (*Id.* at 1–2.) Being familiar with the Project's various maps, Joslin
knew this road was not disclosed in any of the Project's paperwork. (*Id.* at 11.)
The following day, she returned with a camera to document the new road
construction. (*Id.* at 2.) While she was taking photographs from some distance
away, she was approached by the operator of a feller-buncher and two other Forest
Service employees who threatened her with interfering. (*Id.* at 2, 15.) Joslin
contacted Helena Hunters' attorney, who then contacted opposing counsel and
provided them with Joslin's photographs. (*Id.* at 14.) Four days later, after
opposing counsel apparently spoke with a local Forest Service employee who, in
turn, personally inspected the feature, counsel for the Forest Service informed
Helena Hunters that the "feature [depicted in the photographs] is not a road."[3] (*Id.*
at 16.)

One of Joslin's photographs depicts an excavation, with an approximate
depth of three to four feet, leveling the surface of an otherwise sloping landscape.
(*Id.* at 3.) The next photograph shows the same feature as it spreads into a wider
expanse of levelled terrain, revealing a bulldozer in the background. (*Id.* at 4.) All

---

[3] The Forest Service has since back-peddled its position and now claims that only 500 feet of the
2,500-foot feature is a new temporary road and that the rest of the roadwork documented by
Joslin was "preexisting." Counsel now claims that she represented the "feature is not a road"
based on misinformation she received in the temporary absence of a supervising Forest Service
employee. (Doc. 96 at 6.)

-18-

photographs display recently trenched ground. (*Id.* at 3–9.) According to Joslin's measurements, this feature is approximately 2,562 feet in length with an average width of 22.3 feet, although it occasionally widens to as many as 72.5 feet as it rounds a switchback. (*Id.* at 17.)

After Helena Hunters filed its "notice of supplemental authority," Federal Defendants urged the Court to disregard it, claiming that post-decisional photographs of "ground-disturbing work" are not a part of the administrative record, and that the activities depicted are irrelevant to this lawsuit because they occur outside the Lazyman roadless area. (Doc. 96 at 2–3.) The Forest Service now concedes that Joslin's photographs depict a short 500-foot segment of temporary road which was authorized under the timber sales contract, if not the Record of Decision. (Docs. 96 at 6, 97-2 at 4.) The Court subsequently informed the parties that it would construe Helena Hunters' filing as a motion to supplement the administrative record. (Doc. 99.)

## 2. Legal Standard

Under the APA, a court reviewing an agency's decision is instructed to "review the whole record or those parts of it cited by a party." 5 U.S.C. § 706. "The whole record" is "everything that was before the agency pertaining to the merits of its decision," *Portland Audubon Soc. v. Endangered Species Comm.*, 984 F.2d 1534, 1548 (9th Cir. 1993), which includes "all documents and materials

directly or indirectly considered by agency decision-makers [including] evidence contrary to the agency's position," *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989) (citations omitted). Although an agency is entitled to a presumption that the record is complete, this presumption may be overcome by a strong showing to the contrary. *Native Ecosystems Council v. Marten*, 334 F. Supp. 3d 1124, 1129 (D. Mont. 2018). An agency may not hide behind the record rule and deliberately exclude documents adverse to its position. *Fund for Animals v. Williams*, 391 F. Supp. 2d 191, 198 (D.D.C. 2005); *see also Camp v. Pitts,* 411 U.S. 138, 142–43 (1973) (holding that a district court may supplement the record when the record submitted by the agency is so incomplete as to frustrate judicial review). For this reason, the Ninth Circuit provides four narrow exceptions that allow a district court to consider extra-record evidence. *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005).

> A district court may supplement or complete the administrative record:
>
> (1) if admission is necessary to determine "whether the agency has considered all relevant factors and has explained its decision," (2) if "the agency has relied on documents not in the record," (3) "when supplementing the record is necessary to explain technical terms or complex subject matter," or (4) "when plaintiffs make a showing of agency bad faith."

*Id.* Because the agency's "designation and certification of an administrative record" is entitled to a "presumption of regularity," the plaintiff's burden to

demonstrate that an exception applies requires "clear evidence." *Pinnacle Armor, Inc. v. United States*, 923 F. Supp. 2d 1226, 1232 (E.D. Cal. 2013).

Helena Hunters contends that the first declaration is admissible under the first and fourth exceptions as necessary to show that the Forest Service failed to consider the Project's baseline condition and engaged in bad faith. (Doc. 54 at 4– 5.)

### 3. The Baseline Condition

The Forest Service repeatedly contends that only "existing routes" or "existing road templates" will be used to access the roadless area. AR 009185, 007005. Yet the final EIS does not contain any documents, surveys, photographs, or any other information detailing the physical condition of these existing routes. Nor does it disclose with any detail the purportedly minimal work necessary to bring heavy logging equipment into the area. Instead, it indicates that roughly 14 miles of existing routes will be fully obliterated at Project completion. AR 07008.

Federal Defendants assert that the Court must defer to the Forest Service's bald declaration that no road construction is intended because the "highest deference [must be given] to the Forest Service's technical analyses and judgments within its area of expertise." (Doc. 110 at 2 (quoting *League of Wilderness Defs. Blue Mountains Biodiversity Project v. Allen*, 615 F.3d 1122, 1130 (9th Cir. 2010)).) But the Court owes no deference where the Forest Service fails to

-21-

conduct a technical analysis or offer any explanation to which the Court may defer.
As Helena Hunters notes, the Court "cannot defer to a void." (Doc. 78 at 13
(quoting *Oregon Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1121
(9th Cir. 2010)).)

In order to determine whether the Forest Service's decision to use existing
routes in the roadless area is arbitrary and capricious, the Court must be able to
assess whether these routes are reasonably passable.[4] Because there is no
information on these routes, the administrative record in its current iteration
thwarts judicial review. Therefore, supplementing the record with Joslin's first
declaration (Doc. 54-1) is necessary to determine whether the Forest Service's
decision to utilize the existing routes violates the APA. *Powell*, 395 F.3d at 1030.

### 4. Bad Faith

Supplementation is also appropriate because Helena Hunters has made a
sufficent showing of "bad faith [and] improper behavior." *McCrary v. Gutierrez*,
495 F. Supp. 2d 1038, 1043 (N.D. Cal. 2007) (citing *Alabama–Tombigbee Rivers
Coalition v. Kempthorne*, 477 F.3d 1250, 1262 (11th Cir. 2007)). In short, Helena
Hunters contends that the Forest Service intentionally concealed the existing

---

[4] Federal Defendants now claim that whether the roads are passable in their current condition is
not at issue because the Forest Service intends to use vehicles capable of off-road travel and
these vehicles will simply navigate around any obstructions in the road. This explanation would
be reasonable if it was described in the administrative record. The Court will not entertain post-
hoc rationalizations. *Arrington v. Daniels*, 516 F.3d 1106, 1113 (9th Cir. 2008).

condition of the historic routes in the Lazyman Gulch. (Doc. 54 at 5.) The Court

agrees.

The administrative record contains three clues which collectively convey the

Forest Service's intent to conceal the scope of the roadwork intended in the IRA.

Specifically, the Forest Service failed to: (1) classify the minimal treatments

planned for the area using the legal terminology provided in the Roadless Rule; (2)

portray this work on any of its maps; and (3) clearly disclose the routes it intends

to use. As explained more fully below, the Forest Service's deliberate decision to

conceal this information supports a finding of bad faith.

Federal Defendants assert that the only roadwork authorized in the IRA is

the "clearing of debris 'such as rocks and down trees'" (Doc. 88 at 7 (quoting AR

009185)), but nothing in the administrative record justifies why this type of

minimal treatment is permitted under the Roadless Rule. The Roadless Rule

defines three different types of roads[5] and three different types of

---

[5] The Roadless Rule contains the following three road definitions:

> (1) Classified road. A road wholly or partially within or adjacent to National Forest System lands that is determined to be needed for long-term motor vehicle access, including State roads, county roads, privately owned roads, National Forest System roads, and other roads authorized by the Forest Service.

> (2) Unclassified road. A road on National Forest System lands that is not managed as part of the forest transportation system, such as unplanned roads, abandoned travelways, and off-road vehicle tracks that have not been designated and managed as a trail; and those roads that were once under permit or other authorization and were not decommissioned upon the termination of the authorization.

activities.[6] Although the Rule contains a broad prohibition on any activity that results in the addition of classified or temporary road miles, not all activities are prohibited. For example, the "maintenance of classified roads is permissible in roadless areas." *Id.* at 3273.

Why is it then that the administrative record contains no justification for the Forest Service's activities? Does the Forest Service construe its minimal treatments as "road reconstruction" and thus interpret the Rule to allow reconstruction of "unclassified routes"? Alternatively, does the Forest Service construe its activities as permissible "maintenance" of "unclassified routes"? Assuming these interpretations are reasonable, the Forest Service may have been entitled to deference.

---

(3) Temporary road. A road authorized by contract, permit, lease, other written authorization, or emergency operation, not intended to be part of the forest transportation system and not necessary for long-term resource management.

66 Fed Reg. at 3272.

[6] The Roadless Rule characterizes roadwork in the following ways:

Road construction. Activity that results in the addition of forest classified or temporary road miles.

Road maintenance. The ongoing upkeep of a road necessary to retain or restore the road to the approved road management objective.

Road reconstruction. Activity that results in improvement or realignment of an existing classified road defined as follows.

Road reconstruction itself comes in two varieties, "road improvement" and "road realignment." *Id.*

-24-

By avoiding classifying its work as construction, reconstruction, or maintenance, the Forest Service was able to omit it from the "Transportation Plan and Route Closure Methods" map.  The administrative record contains evidence that the Forest Service rushed to develop alternative four and potentially failed to do its due diligence.  AR 010431, 010427.  Although the record indicates that the Forest Service sent people into the field to identify possible transportation routes, the results of this reconnaissance never made it into the record.  AR 010430.  At the eleventh hour, in the process of finalizing the routes table for release along with the draft Record of Decision, one employee struggled with how to display the temporary roadwork necessary for Road No. 4782-003—a segment within the roadless area.  In response, her supervisor told her to meet with another employee who would get her up to speed on how to "display" this work.  Although the contents of that conversation are not present in the record, the result is: the Forest Service deliberately omitted "displaying" any roadwork for Road No. 4782-003 or any other road within the roadless area.

Finally, despite its misleading label, the Project's "Transportation Plan and Route Closure Methods" map does not communicate any of the Forest Service's transportation plans for the roadless area.[7]  Federal Defendants concede as much,

---

[7] Significantly, and in contrast to the Forest Service's map of the "Non-Motorized Trail System," the "Transportation Plan" map does not even disclose the boundaries of the IRA.

-25-

citing the Ninth Circuit's non-precedential decision in *Navickas v. Conroy*, 575 F.

App'x 758, 760 (9th Cir. 2014), for the position that "it is not necessary for the

Forest Service to identify all existing routes that may be used for a project prior to

implementation." (Doc. 110 at 4.) Federal Defendants portray the case as holding

that the "Forest Service had no duty to disclose the particular location or spatial

arrangement of vegetation treatments," when in reality, the *Navickas* panel stated

only that the "Forest Service had no obligation to identify the specific trees that

would be removed as part of the Project." *Id.* Moreover, *Navickas* did not involve

the Roadless Rule, and so it does not provide guidance on when roads must be

identified.

Here, the Forest Service identified only 1.7 miles of preexisting roads in the

Lazyman Gulch and contends that numerous other existing routes can be used

without clearly disclosing the location of these routes. It is simply not true that the

Forest Service had no duty to communicate its transportation plan to the public.

NEPA imposes upon the agency the duty to take a "hard look" when it plans its

actions and "to provide for broad dissemination of relevant environmental

information." *Robertson*, 490 U.S. at 350. The Forest Service was aware that its

decision to mechanically log the roadless area was controversial, and instead of

confronting that decision openly with documentation and analysis, the Forest

Service did just the opposite: it deliberately omitted any information that might

–26–

cast doubt on its assertion that the existing routes could be utilized.  Taken together, the absence of this critical information again supports a finding of bad faith.

The Court feels compelled to make one final observation on the bad faith exception as it applies to Joslin's second declaration.  (Doc. 95-1.)  Federal Defendants are correct that this declaration is not directly relevant to Helena Hunters' claim because it documents activities outside the roadless area.  This declaration also offers questionable value because it depicts only post-decisional activities.  *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 943 (9th Cir. 2006) ("Parties may not use 'post-decision information as a new rationalization either for sustaining or attacking the Agency's decision.'").  Nevertheless, counsel's position that the feature depicted "is not a road" is relevant as the Court considers the truthfulness of the Forest Service's promise that no road construction or reconstruction will occur—an issue that is central to this litigation.  Counsel characterized her statement as an "unfortunate error"—the result of receiving bad information from the Forest Service in the temporary absence of a supervisor.  (Doc. 96 at 6.)  Even so, that anyone, at any time, could assert that the feature depicted "is not a road," smells of bad faith.  The Court will consider this statement only insomuch as it bolsters Helena Hunters' claim that the Forest

Service is not being honest about the roads.  The Court declines to admit this exhibit into the record for any other purpose.

### 5. Additional Discovery

Finally, despite the "strong presumption against discovery into administrative proceedings," *NVE, Inc. v. Dep't of Health & Human Servs.*, 436 F.3d 182, 190 (3d Cir. 2006), discovery is warranted here because the record on this issue is so bare that the Court has no basis to determine whether the Forest Service "entirely failed to consider an important aspect of the problem, or provided an explanation that is contrary to, or implausible in light of, the evidence," *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Citizens to Pres. Overton Park, Inc.*, 401 U.S. at 420 (remanding to the district court to develop the record).  Having opened the door to extra-record evidence, the Court holds it open to receive evidence necessary to reach a decision.  Joslin's first declaration casts doubt upon the Forest Service's conclusion that existing roads may be used, but it does not establish that it is impossible or impractical to bring mechanized equipment into the roadless area. In the face of Federal Defendants' repeated suggestions that the Court not look too closely at this issue (*see* Docs. 62; 65 at 25–26; 88 at 7–9; 96 at 2; 110), the parties were ordered to develop the record with attention to whether these historic routes are passable by heavy mechanized equipment in their current condition.  The

-28-

parties responded by submitting over four hundred pages of additional information, including photographs and video footage. As with Joslin's first affidavit, this information is admitted into the record under the first and fourth exceptions to the record rule. The Court is mindful that, even as it considers evidence outside the record, its review is still constrained by the APA. The Court must ask only whether the Forest Service's decision to use these existing roads is arbitrary and capricious.

## B. The Roadless Rule

In response to the Court's order to develop the record, the parties each submitted hundreds of pages of data gathered by expert field crews documenting the routes in the roadless area.[8] (Docs. 108; 109.) Federal Defendants submitted detailed maps and photographs of the routes depicted on the "Transportation Plan" and clarified that not all of the 14 miles of roads slated for closure will be used to transport equipment. (Doc. 94-1 at 4–5.) In addition, they announced for the first time that there are other routes that were not depicted on the "Transportation Plan" (because they are not scheduled for closure) which are similarly suitable for transporting equipment and documented a few of these routes in their video footage. (Docs. 110 at 4; 94-1 Exhibit C.) In response to the Court's request,

---

[8] For the remainder of this section, when the Court refers to the existing routes it means those routes that are not designated as "system" roads within the Lazyman Gulch IRA.

Federal Defendants also provided a list of equipment that may be used to

implement the Project. (Doc. 108-4.) Now, after inspecting the area, they concede

that these routes are not currently passable. (Doc. 110 at 5.) Despite this, they still

insist that no roadwork is necessary because the vehicles used for logging are all

capable of off-road travel and can simply navigate around obstructions.[9] (*Id.*)

Regardless, the work performed by Helena Hunters clearly refutes the agency's

position that "no [road] improvement" is needed. AR 009185.

For example, the final EIS lists Road 4782-003 as a "haul route," AR

009523, for treatment units 116a, 116b, 116g, and 159, *compare* AR 010705 and

AR 009522 *with* AR 009523,[10] all of which will be logged by mechanized

equipment, AR 009244-45. The road closure map indicates that this road is

scheduled for "obliteration," which means it "will be removed from [the]

Transportation System and obliterated, including recontouring where appropriate,

decompaction/ripping, revegetation, culvert removal, [and] re-establishment of

---

[9] As already explained, the Court will not entertain post-hoc rationalizations for the agency's decision. *Arrington*, 516 F.3d at 1113.

[10] Although the transportation plans were not disclosed in any of the NEPA documents, Helena Hunters pieced together some information by comparing the various maps. However, this comparison does not provide a complete picture of the plans for the roadless area. In the course of conducting their surveys, Helena Hunters learned that some of the road segments identified for closure do not provide access to any of the logging units and are, in fact, non-existent. (Doc. 109 at 10.) It is therefore unclear why the Forest Service would claim this work is necessary or include it in the Project. Helena Hunters also discovered that there are no routes that provide access to the multiple logging units along the continental divide. (*Id.*) It remains unclear how the Forest Service intends to access those units.

natural drainage contours." AR 009522. However, Helena Hunters' survey information reveals that Road #4782-003 is not a road at all—it is a trail roughly 24 to 36 inches wide. (Doc. 109-6 at 6.) Heavy granite boulders and downed trees block large stretches of this trail, and in some places, the trail entirely disappears. (*Id.* at 10–11, 14.) On May 23, 2019, after litigation commenced, the Forest Service dropped unit 116a and 116b due to "feasibility" issues. (Doc. 108-7 at 3.) The Forest Service's subsequent abandonment does not change the fact that the Project authorized this haul route despite the significant roadwork that would be necessary to make the route feasible for hauling.

Road #1813-NS01 is a "closed" "non-system" road in the roadless area, AR 073795, 009705, that provides access to unit 135, *compare* AR 01075 *with* AR 009523. This route is also slated for "obliteration." AR 009522. Yet, according to the field crew assembled by Helena Hunters, this road is difficult to find and, in many places, "nonexistent." (Doc. 109-10 at 4.) The pictures submitted by Helena Hunters reveal that this route is no more than a trail faintly traced onto the landscape and, at times, fully obstructed by debris. (*Id.* at 5–9.)

Finally, the north spurs of Road #4000-001 are "non-system" "closed" roads, AR 073795-97, authorized for mechanized logging of units 102 and 237, *compare* AR 01075 *with* AR 009523. Helena Hunters' field report indicates that the initial portion of this road is a seven-foot wide two-track. (Doc. 109-13 at 8.)

However, as the road moves deeper into the roadless area, it becomes overgrown and ultimately disappears. (*Id.* at 9, 13, 16.)

The remaining data compiled by Helena Hunters reveals similar trends. The majority of the routes are overgrown, impassable, and only faintly visible on the landscape. (Doc. 109 at 7.) The width of the routes varies from nonexistent to roughly four feet, with occasional sections up to seven feet wide. Even so, nearly all of them will need to be widened to support the equipment the Forest Service intends to bring into the area. (*Compare id.* at 9 *with* Doc. 108-4 at 2, 9, 12, 14 (listing a feller buncher with a width of 11 feet, a logger with a width of 9 feet, a track forwarder with a width of roughly 11 feet, and a skidder with a width of 9.5 feet).)

Because Federal Defendants still do not disclose a comprehensive travel plan—and the few details available come from Helena Hunters' comparison of the various maps—it is difficult to say precisely where the Forest Service intends to perform roadwork. Helena Hunters takes the position that any work performed on unauthorized routes constitutes road construction. This is because the Forest Service's use of illegal non-system roads adds them to the system resulting in the addition of temporary road miles.[11] (*See* Doc. 78 at 14–17.) Despite considerable

---

[11] The Court rejects Helena Hunters' argument that road construction is "any activity that results in an increase of an existing road's traffic service level." (Doc. 78 at 15.) The Roadless Rule defines "road reconstruction" in two ways, one of which is "road improvement" which is an

briefing on this issue, Federal Defendants still do not explain why the removal of debris and downed trees is permissible under the Roadless Rule.

Fortunately, it is not necessary for the Court to decide whether the Forest Service's use of non-system routes constitutes constructive road construction, whether these routes meet the definition of "unclassified roads," or whether the activities planned constitute temporary road construction or maintenance. Nor is it necessary for the Court to pinpoint, as a factual matter, the places where the Forest Service's activities constitute illegal road construction. The Court's review under the APA is limited to whether the agency's decision is reasonable in light of the evidence. *Nw. Ecosystem All.*, 475 F.3d at 1140 (citing *Independent Acceptance Co. v. California,* 204 F.3d 1247, 1251 (9th Cir. 2000)).

Here, the Forest Service's position that the Lazyman Gulch IRA contains a network of preexisting roads that may be used for transporting heavy machinery with only minor debris removal is not reasonable. The evidence indicates that these routes are narrow, overgrown, obstructed by rocks and downed trees, and populated with new growth. Federal Defendants assert that the Court cannot assess whether it is feasible to bring heavy machinery along these routes because "[f]orest management is fairly viewed as the sort of technical field where courts should

---

"activity that results in an increase of an existing road's traffic surface level." 66 Fed Reg. at 3272. However, "road reconstruction" appears to only apply to "existing classified roads." *See id.* The vast majority of the roads at issue are not "classified roads."

defer to the findings of specialized administrative agencies." (Doc. 110 at 3

(quoting *Inland Empire Pub. Lands Council v. Schultz*, 807 F. Supp. 649, 652

(E.D. Wash. 1992)).) Here, though, the matter is not one that involves specialized

or expert knowledge. The problem is basic geometry. A vehicle with a wheelbase

9 to 11 feet wide requires a road similarly wide. The Lazyman area does not

contain a network of preexisting roads 9 to 11 feet wide. Therefore, bringing this

equipment into the area will require the Forest Service to widen the roads. The

Forest Service violated the APA because its decision "runs counter to the evidence

. . ., [and] is so implausible that it [cannot] be ascribed to a difference in view or

the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S.*, 463 U.S.

at 43.

Finally, the Forest Service's newly identified roads as depicted in the video

footage cannot save this aspect of the Project. The Record of Decision authorizes

only removal of rocks and downed trees along the roadless area routes. AR

009185; (Doc. 88 at 7). In the videos submitted to the Court, the Forest Service

acknowledges that using these routes will require it to remove small stands of

conifers that have repopulated the path. (Exhibit C_2a_Unit90ab at 6:37, 7:10;

Exhibit C_2d_173ab_90azzz at 1:03, 2:17, 3:11, 4:12.) The evidence therefore

contradicts the agency's position.[12]  In sum, the Forest Service's conclusion that the Lazyman Gulch contains a robust road network that can support large equipment without even maintenance is arbitrary and capricious under the APA and in violation of the Roadless Rule.

### C. The NEPA Issues

Helena Hunters raises two NEPA challenges.  They first challenge the adequacy of the NEPA process: that is, the Forest Service's failure to issue a supplemental draft EIS after creating alternative four.  (Doc. 56 at 26–41.)  They next contend that the final EIS is inadequate because it is misleading.  (*Id.* at 41–47.)  The Court agrees with the latter.  Having already discussed at length why the Forest Service's treatment of the roadwork in the final EIS is inadequate and indicates bad faith, there is little more to say on the second issue.  On remand, the Forest Service will be required to thoroughly develop its plan to bring heavy machinery into the roadless area.

So, the question becomes, at what step in the NEPA process did the Project go astray?  Helena Hunters asserts that the Forest Service was required to analyze alternative four in a supplemental draft because it was significantly different from

---

[12] It is not lost on the Court that the Roadless Rule does not prohibit logging in the roadless area or that Helena Hunters does not challenge tree removal activities.  There is nothing unlawful per se in the Forest Service's recognition that removing standing trees from these routes may be necessary.  The problem is that the Forest Service expressly represented that this work would not be necessary.

the other action alternatives.  (*Id.* at 27–41.)  Federal Defendants assert that this claim is moot because any deficiency in the drafting process was cured when the Forest Service released its final EIS.  (Doc. 65 at 28.)

A draft EIS is designed to provide a summary of all action alternatives and allow the public an opportunity to comment.  40 C.F.R. § 1502.9(a); 40 C.F.R. § 1502.14.  Instead of releasing alternative four in a draft EIS, the Forest Service released a stand-alone summary of the new alternative and provided two public "check-ins".  This summary document did not present alternative four "in comparative form" as required by the regulations.  40 C.F.R. § 1502.14.  And, by the time the Forest Service released the final EIS which provided a side-by-side comparison of all contemplated alternatives, the Forest Service was no longer incorporating the public's feedback.  Federal Defendants are therefore incorrect that this claim is not redressable.  If the Court agrees with Helena Hunters, the Forest Service will be required to release alternative four in a supplemental draft EIS.

An agency must prepare a supplement to a draft EIS when, as pertinent here, "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns[.]"  40 C.F.R. § 1502.9.  A "substantial change" occurs when the new changes are more than a "minor variation" and not "qualitatively

within the spectrum of alternatives that were discussed in the draft[.]" *Russell Country Sportsmen*, 668 F.3d at 1045.

Helena Hunters argues that alternative four's roadwork, construction of mountain bike trails, and withdrawal of the elk security amendment (as explained infra) required a supplemental draft EIS.  (Doc. 56 at 27.)  The Court agrees in part.

Helena Hunters is correct that the roadwork necessary to bring mechanized logging equipment into the Lazyman Gulch IRA required the Forest Service to release a supplemental draft.  Alternative four was the only alternative that proposed mechanized logging in a roadless area.  Given the controversial nature of this proposal, it was a "substantial change." *Id.*  The change was not "qualitatively within the spectrum" of the other alternatives because clearing routes which are overgrown and barely visible will have a disruptive impact on the values of the roadless area for many years.  This roadwork alone required the Forest Service to prepare a supplemental EIS.

However, the Court does not agree that the addition of recreational trails[13] similarly required supplementation.  As with mechanized logging, alternative four

---

[13] Throughout their briefing, Plaintiffs refer to the trails at issue as "mountain biking trails." Federal Defendants and Defendant-Intervenor, the Montana Bicycle Guild, oppose this characterization and insist that the trails are not just for mountain bicyclists but are nonmotorized multiuse trails. (Docs. 65 at 56; 68 at 2.)  In fact, the Montana Bicycle Guild moves for summary judgment on this very issue. (Doc. 68 at 2.)  Although the Court will deny that claim

was the only alternative to propose construction of recreational trails in the Lazyman Gulch. Helena Hunters argues that constructing seven miles of new trails will degrade the roadless area's special value as a biological stronghold for big game species. (Doc. 56 at 36.) Federal Defendants assert that this area already gets considerable recreational traffic on unauthorized routes. (Doc. 65 at 32.) Federal Defendants observe that by consolidating recreational use to authorized trails and closing others, alternative four preserves recreational opportunities while reducing sedimentation and other negative impacts that result from user-created trails. (*Id.* (citing AR 007030, 009183).)

The Court reviews the Forest Service's "decision not to prepare a supplemental EIS under the arbitrary and capricious standard." *Russell Country Sportsmen*, 668 F.3d at 1044. Here, it was not arbitrary and capricious for the Forest Service to conclude that redirecting recreational traffic within the roadless area was a minor deviation from the spectrum of alternatives. Mountain biking is not prohibited in roadless areas. 66 Fed. Reg. at 3245. And, because the area already gets heavy recreational traffic, the decision to relocate that traffic onto authorized routes does not change the roadless area values—making it qualitatively within the spectrum of the alternatives discussed.

---

for want of controversy, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992), the Court will nevertheless refer to the trails as "recreational trails" to accommodate all parties.

The Court similarly concludes that the withdrawal of the elk security amendment did not require supplementation.  When the Forest Service issued the draft EIS it was in the process of releasing a new elk security amendment to the Forest Plan.  Anticipating the change, the draft EIS utilized both the Forest Plan standard 4(a) (which limits open road density as hiding cover decreases) and the soon-to-be enacted elk security amendment.  A few months later, after the elk security amendment was released, the Forest Service voluntarily withdrew the amendment in response to litigation.[14]  Contrary to Helena Hunters assertion, there was nothing improper about the Forest Service discussing elk security in two different ways.

The draft EIS discusses the Project's impacts on elk habitat using standard 4(a) as required by NFMA.  It then goes on to alternatively discuss the impact to elk habitat using the scientific concepts underlying the elk security amendment. Helena Hunters would have the Court tell the Forest Service that its extra credit work results in a failing grade.  There is simply nothing wrong with the Forest Service discussing the Project's impacts to elk through two lenses.

---

[14]  The Forest Service did not withdraw the elk security amendment because it believed there was anything wrong with the new amendment.  AR 045389.  It did so because it was in the process of broader Forest Plan revisions and did not believe that defending the suit was worth its time. *Id.*

## D. The Elk Issue

Having already concluded that the Forest Service was not required to issue a supplemental draft EIS after withdrawing the elk security amendment, the Court's denial of Helena Hunters' NFMA claim should come as no surprise.  Helena Hunters argues that the Project's reliance on the withdrawn elk security amendment is arbitrary and capricious because: (1) the elk security amendment conflicts with standard 4(a); and (2) the Forest Service's erroneous use of the "Montana definition" of elk hiding cover makes it impossible to tell whether the Project complies with big game standards 1, 2, and 3 (which are Forest Plan standards designed to maintain and improve big game security and habitat).  (Doc. 56 at 56.)

As already explained, it is irrelevant that the withdrawn elk security amendment theoretically conflicts with standard 4(a) because the Forest Service used both standards in its analysis.  There is no NFMA violation here.  Turning to Helena Hunters' second point, there was also nothing improper about the Forest Service using the "Montana definition" to determine the Project's compliance with the Forest Plan.  (Doc. 65 at 44–47.)

Standard 4(a) of the Forest Plan "imposes a limit on open road density mileage that decreases as the existing percentage of hiding cover within the elk herd unit decreases." (Doc. 65 at 38 (citing AR 000025–26).)  The standards are

proscribed in a three-column table.  AR 000026.  The first and second columns

provide alternate means of calculated hiding cover.  *Id.*  The first column defines

hiding cover horizontally as "a timber stand which conceals 90 percent or more of

a standing elk at 200 feet" ("Forest Service definition") while the second column

defines it vertically as "a stand of coniferous trees having a crown closure of

greater than 40 percent" ("Montana definition").  *Id.*  Comparing the Forest

Service's definition to the Montana definition provides a measure of equivalency.

*Id.*  For example, 56% hiding cover under the Forest Service's definition

corresponds to 80% hiding cover under the Montana definition.  *Id.*  The formula

accounts for the difference in vantage point: as seen from above, a treed area will

appear denser than it will when standing amongst the trees.  *See id.*

The final EIS calculates open road mileage in the Project against hiding

cover using the Montana definition and concludes that the Jericho Mountain elk

herd unit—the only unit subject to this standard, AR 009181—complies with 4(a).

There is nothing wrong with this determination.

Helena Hunters take issue with the validity of the Montana definition,

arguing that its application yields scientifically indefensible results.  (Doc. 56 at

66.)  Helena Hunters observes that in areas where the trees are dead, the Montana

definition would calculate significantly lower percentages of hiding cover because

the crown closure of dead trees generally falls below the 40% threshold, when in

reality standing dead trees can provide hiding cover.  (Doc. 56 at 63–66.)  If anything, this argument cuts against Helena Hunters.  If the Montana definition underestimates the coverage possibility of dead trees, a Project's conclusion that coverage remains intact after logging means that more "actual" hiding cover will remain across the elk herd unit.  Although the Court appreciates the difference in methods of calculation and agrees that it is important that the Forest Service pick the best method, the Forest Plan expressly permits both.  This is a decision to which the Court must defer.  *Nat'l Wildlife Fed'n*, 422 F.3d at 798.

There was nothing arbitrary about the Project's use of the Montana definition here. For this reason, it is not necessary to address Helena Hunters' remaining arguments.

## I.    Alliance's Claims

Alliance claims the Project is arbitrary and capricious because: (1) the Forest Service violated NEPA by failing to address the Tenmile and Telegraph Project in a single EIS; (2) the Tenmile Project's Biological Opinion is inadequately detailed in violation of the ESA; and (3) the Forest Service violated NFMA and NEPA by failing to comply with the Forest Plan's standards for open road density in occupied grizzly bear habitat.  (Doc. 45 at 2.)

## A. The NEPA Issue

Alliance claims that the Forest Service violated NEPA by failing to analyze the Tenmile and Telegraph Projects in a single EIS when the Projects constitute a "single course of action," *see* 40 C.F.R. § 1502.4(a), and, alternatively, "cumulative actions," *see* 40 C.F.R. § 1508.25.

Under the subheading "scope," the regulations implementing NEPA require that connected and cumulative actions be analyzed in a single NEPA document. 40 C.F.R. § 1508.25(a)(1)–(2) (hereinafter "scoping regulation"). A separate regulation explains that major federal actions are required to be analyzed in an EIS. 40 C.F.R. § 1502.4(a) (hereinafter "major actions regulation"). The major actions regulation directs the agency to use the criteria set forth in the scoping regulation to determine the scope of the analysis—the range of alternatives and the impacts that ought to be considered. *Id.* The major actions regulation also instructs that "[p]roposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement." *Id.*

As an initial matter, Alliance is incorrect that both cited regulations impose an independent basis for requiring analysis in a single NEPA document. Rather, the major actions regulation defines "a single course of action" by cross reference to the scoping regulation. In other words, a "single course of action" is a

connected or cumulative action.  *Pac. Coast Fed'n of Fishermen's Assocs. v. Blank*, 693 F.3d 1084, 1098 (9th Cir. 2012).  Alliance does not contend the Tenmile and Telegraph Projects are connected actions.  (Doc. 79 at 6.)  The only question then is whether the Projects are cumulative actions.

A cumulative action is an action which "when viewed with other proposed actions ha[s] cumulatively significant impacts and should therefore be discussed in the same impact statement." 40 C.F.R. § 1508.25(a)(2).  The requirement that cumulative actions be analyzed together prevents the agency from "dividing a project into multiple 'actions,' each of which individually has an insignificant environmental impact, but which collectively have a substantial impact." *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 894 (9th Cir. 2002) (quoting *Thomas v. Peterson*, 753 F.2d 754, 758 (9th Cir. 1985)).  The Ninth Circuit imposes a demanding standard to overturn an agency's decision to undertake separate NEPA documents, the hallmark of which is bad faith.

In *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998) (hereinafter "*Blue Mountains*"), the Ninth Circuit determined that the Forest Service violated NEPA by failing to examine five timber sale projects in a single EIS when the projects were "proposed simultaneously, would occur simultaneously, were located within the same watershed, and were designed to address the aftermath of a series of fires that devastated the forest surrounding the

North Fork of the wild and scenic John Day River." *Friends of Wild Swan v. Kehr*, 321 F. Supp. 3d 1179, 1188 (D. Mont. 2018), *aff'd*, 770 F. App'x 351 (9th Cir. 2019) (citing *Blue Mountains*, 161 F.3d at 1210).  Not only were the projects geographically adjacent and set to proceed on similar timelines, but there was evidence to suggest that by addressing the projects in five separate NEPA documents, the Forest Service intentionally segmented review in order to minimize the combined environmental impact. *Blue Mountains*, 161 F.3d at 1215 n.6. Internal memoranda and communications revealed that the Forest Service recognized the project was controversial and therefore elected to analyze the actions separately to "simplif[y]" the NEPA process and to allow smaller logging actions to go forward in the event that certain projects were held up in litigation. *Id.*  The court was troubled by the fact that many of the individual project environmental assessments did not disclose the existence of the surrounding projects which indicated that the agency was concealing the scope of those impacts. *Id.* at 1216.

By contrast, in *Earth Island Institute v. United States Forest Service*, the Ninth Circuit upheld the Forest Service's decision to consider adjacent timber salvage projects in separate NEPA documents when "nothing in the record suggest[ed] that the agency intended to segment review to minimize" the cumulative effects of the projects.  351 F.3d 1291, 1295–96 (9th Cir. 2003)

(citation omitted).  Although the two projects shared a common purpose to restore forest health after the area suffered damage from a forest fire, the two projects were located on separate national forests and set to proceed on separate schedules. *Id.*

Alliance claims the Tenmile and Telegraph Projects are "cumulative actions" because the Projects are directly adjacent, share a boundary line, authorize abutting timber harvest units along the continental divide, and occur within the same analysis areas for lynx, grizzly bears, and elk.  More significantly, Alliance claims that the Forest Service intentionally segmented review in order to conceal the extent of the combined impact to elk hiding cover along the continental divide.  (Docs. 45 at 11–20; 79 at 9–14.)

Federal Defendants urge the Court to follow the approach taken in *Friends of Wild Swan v. Kehr*.  There, this Court did not require the Forest Service to prepare a single EIS for two timber sale projects which "fit together like puzzle pieces" because it found the "constellation of factors" present in *Blue Mountains* lacking—namely, there was no evidence to suggest that the Forest Service intended to segment review when both projects addressed the existence of the other.  321 F. Supp. 3d at 1184–85, 1189.  Federal Defendants assert the same is true here.  The Telegraph and Tenmile Projects were proposed at different times,

were intended to proceed on different timelines,[15] address different purposes, and, although adjacent, occur on opposite sides of the continental divide and therefore within different watersheds. Federal Defendants also insist that there is no evidence of intent to minimize the combined impacts because, as in *Friends of Wild Swan*, both Projects recognize and address the existence of the other. (Doc. 65 at 47–54.)

Although the Projects share geographic similarities, the remaining factors make the circumstances here distinguishable from *Blue Mountains*. First, although the Telegraph and Tenmile Projects were simultaneously in development from 2014 to 2017, the Telegraph Project was initiated first. Scoping for the Telegraph Project began in 2009, whereas scoping for the Tenmile did not begin until 2014. *Compare* AR Telegraph-00000813 *with* AR 020788. While the Telegraph Record of Decision was issued in January of 2017, the Tenmile Record of Decision was not issued until December of 2018—almost two years later. *Compare* AR Telegraph 00089015 *with* AR 009171. To have addressed the Projects in a single EIS, the Forest Service would have had to delay the Telegraph Project while planning relative to Tenmile caught up.

---

[15] Although the Telegraph Project was proposed 5 years before the Tenmile Project, litigation has delayed the Telegraph Project so that the two are now set to begin on similar timelines.

Second and relatedly, unlike in *Blue Mountains*, the Projects were not intended to proceed on the same timeline.  *See Blue Mountains*, 161 F.3d at 1215. That the Projects are now set to proceed on similar timelines as a result of litigation does not indicate that the Forest Service arbitrarily decided to treat the Projects as separate NEPA actions.

Third, although the Projects share a common purpose of reducing forest fuels, the Tenmile Project has a broader scope.  *See Blue Mountains*, 161 F.3d at 1210.  The Tenmile Project has a central goals of protecting Helena's water supply and improving recreational opportunities.  The Tenmile Project's intersection within two roadless areas presents a distinct challenge not present in the Telegraph Project.  Finally, the Tenmile Project's collaborative community planning efforts highlight its unique characteristics.  And, although the Projects share a common boundary along the continental divide and overlap in wildlife analysis areas, as in *Friends of Wild Swan*, geography alone is not dispositive, particularly in the absence of any indication that the Forest Service intended to segment the Projects to avoid comprehensive review.

Alliance points to certain deficiencies in the Tenmile Project's cumulative effects analysis—the most glaring of which is its failure to disclose that logging in each Project along the continental divide ridgeline will intersect in four places and leave combined clear-cut openings larger than either Project describes.  However,

-48-

Alliance does not raise a substantive challenge to the Forest Service's cumulative effects analysis; Alliance challenges only its form. *Native Ecosystems Council v. Marten*, No. CV 17-47-M-DLC-JCL, 2018 WL 3630132, at *4 (D. Mont. July 31, 2018). Evidence that the Forest Service could have done more to explain the Project's combined impact on elk security along the continental divide ridgeline does not indicate that the Forest Service intentionally segmented its analysis to conceal these openings, particularly when the Forest Service specifically sought a Project-wide exemption from Amendment 6 (which would otherwise have prohibited clear-cut openings in excess of 100 acres). AR 006047. Any inkling of concealment here is a far cry from the evidence of bad faith in *Blue Mountains*. *See* 161 F.3d at 1215 n.6. The Forest Service did not violate NEPA by undertaking separate analyses of the Telegraph and Tenmile Projects.

## B. The Grizzly Bear Consultation Issue

Alliance claims the Biological Opinion violates the ESA because it does not adequately discuss the impact on grizzly bears from the Project's addition of recreational trails, reduction in linkage habitat, and disturbance associated with helicopter-ignited prescribed fire. (Doc. 45 at 25.)

Pursuant to its Section 7 consultation obligations, the Forest Service requested and received information from the FWS that two listed species (grizzly bears and lynx) and one proposed species (wolverine) were present in the Project

area.  AR 009802.  The Forest Service then prepared a Biological Assessment for the Project which, as it pertains to grizzly bears, concluded that the Project "may affect" and is "likely to adversely affect" grizzly bears.  AR 009531.  Specifically, the Biological Assessment identified six components of the Project that posed a threat to grizzly bears, only three of which are pertinent to Alliance's challenge: the Project's addition of 35 miles of recreational trails, its impact on linkage habitat, and the effect of helicopter prescribed burn.  AR 009580–81.

The Forest Service's may-adversely-affect determination triggered the need for formal consultation.  50 C.F.R. § 402.14.  The Forest Service requested consultation on March 5, 2018.  AR 009531.  The FWS issued its Biological Opinion on December 17, 2019, ultimately concluding that the Tenmile Project was not likely to jeopardize the continued existence of the grizzly bear.  AR 009802, 009839.

Alliance claims the Biological Opinion is inadequate because it entirely fails to address the addition of recreational trails and engages in only conclusory analysis of linkage zone and helicopter-ignited burning.  (Doc. 45 at 29, 35.)

## 1. Recreational Trails

"[T]he ESA requires [a] biological opinion to analyze the effect of the entire agency action."  *Connor v. Burford*, 848 F.2d 1441, 1453 (9th Cir. 1988).  When the Forest Service raises concern that a certain aspect of a project has potential to

harm an ESA-protected species, the biological opinion must address that factor; its

failure to do so violates the ESA and the APA. *Pac. Coast Fed'n of Fisherman's*

*Assoc. v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1091 (9th Cir. 2005); *Ctr.*

*for Biological Diversity v. Bureau of Land Mgmt.*, 698 F.3d 1101, 1121 (9th Cir.

2012).

Alliance claims that the Biological Opinion is inadequate because it does not

discuss the effect of Project's addition of 35 miles of recreational trails on grizzly

bears. (Doc. 45 at 25.)  In response, Federal Defendants assert that Alliance's

portrayal is factually inaccurate.  Federal Defendants clarify that the Project only

adds four new miles of trail, as sixteen miles already exist and eleven miles will be

realigned or reconditioned.  Federal Defendants also insist that the Biological

Opinion does not ignore the Biological Assessment's conclusion that recreational

trails are likely to affect grizzly bears but rather determined that trail use was "not

likely [to] resul[t] in adverse effects to grizzly bears within the action area." (Doc.

65 at 56.)

Federal Defendants are correct that the Biological Opinion contains a single

sentence addressing the sixteen miles of recreational trails that currently exist in its

discussion of the baseline condition.  AR 009827.  The Biological Opinion does

not, however, recognize that the Project will add trails and improve others, much

less discuss the effects of these actions.  AR 009809, 009828–38.  Importantly,

-51-

given that the Biological Opinion recognizes that the Project's construction of temporary roads in secure areas is likely to adversely affect grizzly bears in the short term, AR 009832, 009838, its failure to discuss the addition of permanent recreational trails within the roadless areas is a significant deficiency. And, because it omits any discussion of trail construction or improvement, there can be no reasonable argument that it lawfully tiers to any programmatic assessment of those effects. *See Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 997 (9th Cir. 2004) (determining that a project cannot tier to another document without specifically acknowledging the purportedly tiered subject matter).

The Biological Assessment recognized that the Project's addition of "non-motorized trails" in grizzly bear secure areas was one of the Project's "effects" and that "grizzly bear survival is strongly linked to the availability of secure habitat." AR 009581–82. Therefore, the Biological Opinion's failure to recognize—much less analyze—the effects of building and improving recreational trails violates the ESA and the APA. *Ctr. for Biological Diversity*, 689 F.3d at 1124.

## 2. Helicopter-Ignited Burning and Linkage Zone

Alliance claims that the FWS's conclusory discussion of helicopter prescribed burn and linkage zone violates the ESA because it fails to provide the required "detailed discussion" of the Project's effects on grizzly bears. (Doc. 45 at

32–36.)  Consistent with the Court's recent determination reviewing the Telegraph

Project, *Native Ecosystems Council*, 2018 WL 3630132, at *10,  Federal

Defendants assert that the discussion of these effects is sufficiently detailed

particularly when read in context of the fuller discussion contained in the

Biological Assessment.  They assert that the nearly identical discussion of these

issues in Telegraph Projects' Biological Assessment and Biological Opinion makes

this issue legally indistinguishable from the one asserted in that litigation.  *See*

*Native Ecosystems Council*, 2018 WL 3630132, at *9, *aff'd in relevant part sub.*

*nom. All. for the Wild Rockies v. Marten*, 789 F. App'x 583 (9th Cir. 2020).  The

Court agrees.

When the Forest Service determines that an action may have an effect on a

protected species, the regulations require that the corresponding biological opinion

contain a "detailed discussion" of those effects.  50 C.F.R. § 402.14(h)(2) (2015).

The FWS's failure to discuss those effects and articulate a rational explanation for

its conclusion constitutes arbitrary action.  *Ctr. for Biological Diversity*, 689 F.3d

at 1121.  However, it is not improper for the biological opinion to incorporate or

refer to the analysis contained in the biological assessment where it agrees with

that analysis.[16]  *Native Ecosystems Council*, 2018 WL 3630132, at *9.  A

---

[16] Alliance asserts that the newly enacted consultation regulation that permits a biological
opinion to incorporate a biological assessment by reference was not in effect at the time
consultation on the Project began.  (Doc. 79 at 25 (citing 84 Fed. Reg. 44976-02, 2019 WL

biological opinion is sufficiently detailed when, read in its full context, it "examines the relevant data and articulate[s] a satisfactory explanation." *Ctr. for Biological Diversity*, 689 F.3d at 1121.

Here, the Biological Opinion's analysis of helicopter prescribed burn is adequately detailed. It explains that that the reason that helicopter activities have an "insignificant" "disturbance effect" on grizzly bears is that the activities will last for only two to four hours per day over a 48-hour period. AR 009838, 009840. This, combined with those portions of the Biological Assessment and a subsequent addendum, AR 00704–05, 009580, which are incorporated by reference, AR 009809, provide a thorough analysis of this effect. *All. for the Wild Rockies*, 789 F. App'x at 584.

The same is true for the analysis of the effects on potential linkage zone, which are determined to be insignificant, AR 009836, because grizzly bears can use alternate routes, AR 009586. After reading the discussion contained in the Biological Opinion, which agrees with and references the analysis contained in the Biological Assessment, the discussion is sufficiently detailed.

---

4016832, at *44979 (Aug. 27, 2019).) While that is true, there is no law to suggest that this practice was previously impermissible. To the contrary, the Ninth Circuit's summary affirmance of the Telegraph Project indicates that the practice, though not formally recognized by regulation, was permissible prior to enactment of the regulation.

## C. The Grizzly Bear Roads Issue

Alliance claims that the Forest Service violated NFMA because the Project does not comply with Forest Plan standard 3 for managing "occupied grizzly bear habitat." (Doc. 45 at 37.) Forest Plan standard 3 provides that "in occupied grizzly habitat, to minimize man-caused mortality[,] the open road density will not exceed the 1980 density of 0.55 miles per square mile, which was determined to have little effect on habitat capability." AR 000027.

There is no dispute that the Project fails this standard. Rather, Federal Defendants argue that although grizzly bears have been known to occupy the area in a colloquial sense, the Project is not within designated "occupied grizzly bear habitat" as defined by Appendix D to the Forest Plan. (Doc. 65 at 64–68.)

NFMA requires that each national forest develop a "Land and Resource Management Plan." 16 U.S.C. § 1604(a). All projects must be consistent with the governing forest plan. *Id.* at 1604(i). The Forest Service violates NFMA when it authorizes an action that does not comply with the forest plan. *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 961 (9th Cir. 2005).

Although the Forest Service somewhat misleadingly refers to the Project area as "occupied" by grizzly bears, AR 009539, Federal Defendants are correct that the Forest Plan designates "occupied grizzly habitat" as those areas indicated in Appendix D, and the term "occupied" refers to management areas that were

-55-

"occupied prior to 1984." AR 000027. The Forest Plan explains that standard 3's requirement of maintaining open road density at or below .55 miles per square mile in occupied grizzly habitat refers to "the guidelines in Appendix D to the Management Situation 1 and 2 (referring to essential and occupied prior to 1984) . . ." *Id.*

While the Tenmile Biological Assessment explains that grizzly bear sightings have increased along the divide landscape since the 1990s, AR 009564— which may cast some doubt on the continued scientific validity of the Forest Plan's designation of MS 1 and 2—the Forest Plan is nevertheless clear that "occupied grizzly habitat" has a precise geographic scope corresponding to the map at Appendix D. *See* AR 000216. The Biological Assessment is similarly clear that the "Forest Plan requirements for Management Situations 1 and 2 and the requirement for maintaining a minimum open road density of $0.55 \text{mi}/\text{mi}^2$ in occupied grizzly habitat do ***not*** apply" to the Project area. AR009564 (emphasis in original). Therefore, Alliance's contention that the Project violates NFMA is inapposite.

## II.     Remedy

Helena Hunters' requested relief impacts only a portion of the overall Project area. They only challenge the Project's activities in the Lazyman Gulch IRA and carve out the private land buffers within the roadless area. (Doc. 101 at

3.)  Within this boundary, Helena Hunters asks the Court to vacate the portion of the Record of Decision with respect to the use of mechanized equipment, roadwork, and new single-track mountain bike trails in the Inventoried Roadless Areas.  Alliance requests the Court vacate the entire Tenmile Record of Decision and Biological Opinion and remand to the agencies.  (Doc. 45 at 44.)

Vacatur is the presumptive remedy.  *All. for the Wild Rockies v. United States Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018).  However, where equity requires, a court may fashion a more limited remedy upon weighing the "seriousness of the agency's errors against 'the disruptive consequences'" of delay, *Pollinator Stewardship Council v. U.S. E.P.A.*, 806 F.3d 520, 532 (9th Cir. 2015) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)).

Because Helena Hunters does not request vacatur of the entire Project, the equities clearly favor more limited relief—at least as it pertains to their claims. Having found that the Project violates the Roadless Rule, NEPA, and the APA, the Court will vacate the portion of the Project that occurs in the Lazyman Gulch IRA (except for the private land buffers) and remand to the agency.  If the Forest Service would like to pursue any activities in the Lazyman Gulch IRA, it will need to issue a supplement draft EIS that fully discloses its plans for that area.

Turning to Alliance's claims, it is appropriate for the Court to vacate the Biological Opinion and remand to FWS to determine the impact of the Project's construction of recreational trails on grizzly bears. The Court will similarly vacate that portion of the Tenmile Project which authorizes the construction of new mountain bike trails pending completion of a Biological Opinion. However, given the limited nature of this error, the Court will allow the rest of the Project to go forward. Vacating the remainder of the Project is unnecessarily disruptive given the importance of preserving Helena's water supply and time-sensitive nature of the Project.

IT IS ORDERED that Alliance's Motion for Summary Judgment (Doc. 43) is GRANTED in part and DENIED in part. Alliance prevails on its claim that the Project's Biological Opinion failed to include a detailed discussion of the 35 miles of recreational trails on grizzly bears.

IT IS FURTHER ORDERED that Helena Hunters' First Motion to Supplement the Administrative Record (Doc. 54) is GRANTED.

IT IS FURTHER ORDERED that Helena Hunters' Motion for Summary Judgment (Doc. 55) is GRANTED in part and DENIED in part. Helena Hunters prevails on its claims that: (1) the Forest Service violated the Roadless Rule; (2) The Forest Service violated NEPA by failing to issue a supplemental draft EIS that discusses the alternative four's roadwork; and (3) the Forest Service's FEIS is

misleading and fails to disclose and adequately analyze the impacts to the roadless areas' values.

IT IS FURTHER ORDERED that Federal Defendants' Cross Motion for Summary Judgment (Doc. 63) is GRANTED in part and DENIED in part. Federal Defendants prevail on their claims that: (1) the Project complies with NFMA; (2) the Forest Service's decision to prepare separate environmental impact statements for the Telegraph and Tenmile Project's complies with NEPA; and (3) the Project is consistent with Forest Plan Standard 3 and there is no NFMA or NEPA violation on this issue.

IT IS FURTHER ORDERED that Montana Bicycle Guild, Inc.'s Cross Motion for Summary Judgment (Doc. 66) is GRANTED in part and DENIED in part. Its claim that Helena Hunters mischaracterized the recreational trails is DENIED for lack of jurisdiction. Its claim that the Forest Service was not required to issue a supplemental draft EIS with respect to the recreational trails is GRANTED.

IT IS FURTHER ORDERED that Helena Hunter's second motion to supplement the administrative record (Doc. 95) is GRANTED in part and DENIED in part. It is granted only for a limited purpose, consistent with this Order.

IT IS FURTHER ORDERED that, in accordance with this Court's prior order (Doc. 107) the administrative record is supplemented with information regarding the roadless area routes (Docs. 108; 109).

The Clerk of Court is directed to enter judgment of dismissal by separate document.

DATED this 1st day of July, 2020.

Dana L. Christensen, District Judge
United States District Court